Submitted June 29, 2015 resubmitted en banc April 13, reversed and remanded August 30, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHARLES WAYNE CRUM,
*Defendant-Appellant.*

Coos County Circuit Court
13CR0509; A155484

403 P3d 405

Peter Gartlan, Chief Defender, and Lindsey Burrows, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Susan G. Howe, Assistant Attorney General, filed the brief for respondent.

Before Hadlock, Chief Judge, and Armstrong, Ortega, Egan, DeVore, Lagesen, Tookey, Garrett, DeHoog, Shorr, and James, Judges, and Sercombe, Senior Judge, and Duncan, Judge pro tempore.

## DUNCAN, J. pro tempore

In this criminal case, the state charged defendant with four counts of menacing, a misdemeanor, ORS 163.190.[1] The charges were based on an incident during which, according to the state's witnesses, defendant pointed an air rifle at a law enforcement officer, who was accompanied by three other officers. The four officers then shot at defendant, firing a total of more than 50 shots and wounding defendant's right arm. Defendant admitted carrying the air rifle, but contended that he had held it at his side and pointed down at all times. He asserted that the officers had overreacted when they saw the air rifle, shot at him, and, later, in order to justify the shooting, falsely stated that defendant had pointed the air rifle at them. To impeach the officers, defendant sought to admit evidence of their agencies' use-of-force policies, on the theory that the officers had a motive to state that they acted in conformance with those policies. The trial court excluded the evidence, and a jury convicted defendant of the four charged counts. Defendant appeals, assigning error to the trial court's exclusion of the motive evidence. For the reasons explained below, we conclude that defendant preserved his challenge to the trial court's exclusion of the evidence, the exclusion of the evidence was error, and the error was not harmless. Therefore, we reverse and remand.

## I. HISTORICAL AND PROCEDURAL FACTS

### A. *Shooting Incident*

Around 6:00 p.m. on December 25, 2012, defendant called 9-1-1, seeking medical assistance. Defendant said that he needed an ambulance because his "health was deteriorating."

A police officer responded to defendant's residence, which was one of several trailers in a clearing in a wooded area at the end of a narrow dirt road. The officer saw defendant standing near the trailer, holding a shiny, silver object.

---

[1] ORS 163.190 provides, "A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury."

The officer identified himself to defendant, stating his name and his police department. Defendant turned and walked away. The officer left the clearing and called for back-up.

Meanwhile, defendant called 9-1-1 and asked why an ambulance had not been sent, telling the dispatcher:

"All the sudden the cops showed up.

"* * * * *

"I'm sorry they're not supposed to be here. I wanted an ambulance.

"* * * * *

"* * * If I die tonight, it's on you."

An ambulance and three other officers met with the first officer at the beginning of the dirt road leading to the clearing. The officers learned that defendant had a bench warrant for failing to appear for court, a misdemeanor. They decided to attempt to contact defendant, to determine whether he needed medical assistance. They did not plan to take any action on the warrant at that time.

The officers drove down the dirt road in two patrol cars with the headlights off. They stopped their cars at a wide spot in the road and walked the remaining distance to the clearing. Each officer carried a tactical rifle. Once in the clearing, two of the officers knocked on defendant's trailer door, but no one answered. A man, Smith, came out of another trailer and told the officers that defendant had walked away from the area. One of the officers, Mitchell, spoke with Smith and searched his trailer, but found nothing. The officers decided to leave, and as they were heading out, Mitchell heard a noise in defendant's trailer. Mitchell alerted the other officers and started walking toward the trailer. The trailer door opened, and the officers saw defendant, who was holding an air rifle.

The parties dispute what happened next. Defendant contends that he was holding the air rifle at his side, pointed toward the ground. The state contends that defendant raised the air rifle, which the officers believed was an actual rifle, and pointed it at Mitchell.

The officers then shot at defendant, firing a total of more than 50 shots between the four of them. Defendant did not fire a single shot.

After two bursts of shooting by the officers, Mitchell called out to defendant and asked if he had been hit. Defendant, who had been shot in the arm, told Mitchell that he had been hit. Mitchell told defendant to show him his hands, which defendant did. Two officers grabbed defendant, pulled him out of the trailer, and handfcuffed him. The officers arrested defendant and put him in the ambulance to be transported to a hospital. On the way to the hospital, defendant asked the officer who was traveling with him why the officers had shot him in the arm and told him that they "should have shot him right here," while pointing to his forehead.

The state charged defendant with four counts of menacing, one for each of the officers involved in the incident. Each count alleged that defendant "did unlawfully and intentionally attempt to place [the officer] in fear of imminent serious physical injury."

B. *Pretrial Motions*

Defendant filed a pretrial motion for an order allowing evidence of the use-of-force policies of the two law enforcement agencies whose officers were involved in the shooting. In his motion, defendant asserted that evidence of the policies was relevant to the jury's determination of "whether [he] in fact menaced the officers, or whether the charges were filed as a means to justify the use of deadly force by the officers." In other words, defendant asserted that the evidence was relevant to an assessment of whether the officers had fabricated their allegations that he menaced them in order to justify their use of deadly force.

In addition to his pretrial motion regarding the use-of-force policies, defendant filed a separate motion for an order allowing evidence that defendant had "retained counsel for filing a civil lawsuit against the State, its various subdivisions and agencies, as well as the four individual officers, and that the counsel has filed a Tort Claim Notice under ORS 30.275 as a step in the pursuit of the lawsuit." In

the motion, defendant asserted that the tort-claim evidence was admissible to show that the officers had "an interest or bias in claiming that the defendant menaced them, since, if true, that would defeat the civil lawsuit."

The trial court held a hearing on the motions, and the parties and the court addressed the motions separately, beginning with the motion concerning evidence of the use-of-force policies. Defense counsel explained that his theory of the case was that defendant did not menace the officers at all; instead, when the officers saw defendant with the air rifle pointed down, they overreacted and shot defendant and, thereafter, the officers claimed that defendant had pointed the gun at one of them, in order to justify their use of deadly force:

"[DEFENSE COUNSEL]: [Defendant will] say there was no menacing at whatsoever.

"THE COURT: Okay.

"So, I don't see how the use of force policies have any bearing on the case at all.

"Do you have any other argument?

"[DEFENSE COUNSEL]: I think it kind of ties in with our related argument regarding the civil suit that they did in fact violate the use of force policies in this situation and—

"THE COURT: (Interposing) But, we're not going to try the civil case here.

"[DEFENSE COUNSEL]: Correct.

"I am—well, I understand that. That—as—*there's going to be a claim that [defendant] menaced them to justify the use of force.* That's essentially the story.

"THE COURT: So, they made up a story, phonied up a call to 9-1-1 so they could go shoot him?

"[DEFENSE COUNSEL]: Negative. Or rather, it was more that *they made up a claim that [defendant] was threatening them with a firearm when [he] was not, to justify their use of force in this case.*

"THE COURT: But that's still a question this jury will never get to because if they agree with him that he didn't

menace anybody, they find him not guilty and we're done. So, use of force question has no bearing on it."

(Emphasis added.) Thus, defense counsel repeatedly told the court that he was offering the use-of-force-policy evidence to support his claim that the officers had fabricated their allegations against defendant in order to justify their use of force. That is, defense counsel took the position that the evidence was relevant to show that the officers had a motive to assert that defendant had menaced them, because, if defendant had menaced them, then their use of force would not have violated the policies. The trial court rejected defense counsel's assertions and denied defendant's motion regarding the use-of-force-policy evidence on the ground that the evidence was irrelevant.[2]

The trial court then turned to defendant's separate motion regarding the tort-claim evidence. The state argued that that evidence was not admissible to show that the officers were biased or self-interested because the officers "would be indemnified * * * from * * * any sort of civil lawsuit." The trial court rejected that argument and ruled that the evidence was admissible. But the trial court remarked that the evidence "could be a double edged sword" if defendant testified, because the state could use it to show that defendant had a financial motive to testify to certain facts.

C. *Trial*

At trial, the state's theory was that, on the night of the incident, defendant was suicidal and had tried to

_____

[2] We acknowledge that the denial of a pretrial motion to admit specific evidence does not necessarily preclude the admission of all evidence on the subject matter. However, in this case, the parties and the trial court treated defendant's motion as concerning the policies as a subject matter. The trial court's denial of defendant's motion to admit evidence concerning the policies was categorical and the parties understood it as such. At trial, when defense counsel objected to a question the prosecutor asked one of the officers on the ground that it concerned the policies, the prosecutor did not dispute that the trial court had excluded evidence concerning the policies; instead, the prosecutor asserted that the "line of questioning doesn't get into the policies at all."

The trial judge, who was a different judge than the judge who had ruled on the pretrial motions, shared the parties' understanding of the pretrial judge's ruling, observing that, based on its review of the pretrial order, it had "assumed we weren't going to get into the policies."

provoke the officers to shoot him. To support its theory, the state presented as witnesses the four officers who had been involved in the incident. Each of the officers testified that defendant had raised the air rifle and pointed it at Mitchell.

The state also presented evidence regarding defendant's statements. That evidence included the statement that defendant made to the 9-1-1 dispatcher when he called to complain that an ambulance had not arrived ("If I die tonight, it's on you") and the statement he made to the officer who rode with him to the hospital (that the officers "should have shot him" in the forehead). It also included testimony from Smith, the man who had been in one of the trailers on the night of the incident. Smith testified that defendant had been in a lot of pain that night and had been trying to get help, but no one was responding. According to Smith, defendant was "hurting" and said that he "wanted to go ahead and die."

In addition, the state presented evidence that defendant had photographs next to his bed. A detective testified that the photographs appeared to be of family or friends and that, in his experience, people often will have "photos of things that mean a lot to them laid out in the cases where they expect their death, whether it's natural or a suicide." The detective referred to the photographs as a "shrine," and a deputy medical examiner testified that such "shrines" are occasionally found during investigations of suicides and attempted suicides.

Another detective and the medical examiner also testified about a "reconstruction" they had done to determine the position of defendant's arms when he was shot. The medical examiner concluded that defendant's wounds were caused by a single bullet, which grazed defendant's forearm, entered and exited defendant's upper arm, and then re-entered his upper arm.[3] In the reconstruction, the detective stood in place of defendant, and the medical examiner marked the detective's arms to show the locations of

---

[3] The medical examiner testified that, in her opinion, a bullet grazed defendant's forearm, and then caused a "through and through" injury, by going through a fold of skin and coming out the other side, and then entered defendant's upper arm again.

defendant's wounds. Using a dowel to simulate the trajectory of a bullet, they then attempted to determine what position defendant's arm would have had to have been in for a single bullet to cause all of the wounds. Based on their reconstruction, the detective believed that defendant had the air rifle raised and nearly leveled when he was shot.

Defendant disputed the state's theory and evidence, asserting that he had not been suicidal and he had not pointed the air rifle at the officers; instead, the officers had overreacted when they saw the air rifle pointed down. Regarding whether he had been suicidal, defendant testified that, on the night of the incident, he was in pain and had called for an ambulance because he wanted medical assistance. Smith's girlfriend, who had visited with defendant shortly before the shooting, testified that defendant was in severe pain, with visible symptoms, but that he did not express any thoughts of suicide and was trying to get a ride to the hospital. Regarding the rifle, defendant testified that he held it "[f]acing the floor." When he attempted to close his trailer door, "[i]t might have been coming up just a little bit," to "[a]bout a forty-five degree angle[.]"

Defendant also challenged the accuracy of the reconstruction, which was premised on the theory that a single bullet caused all of defendant's wounds. Defendant testified that he was shot in the arm twice. Defendant also elicited testimony from the detective who conducted the reconstruction, including that the detective had not received "any formal training as far as wound reconstruction or trajectory training" and the reconstruction was not "a scientific experiment." The detective acknowledged that the reconstruction was not based on the actual height of defendant or his trailer door. The detective, who stood in for defendant in the reconstruction, is "several inches" taller than defendant, and the stool he stood on to simulate the height of the trailer door "just happen[ed] to be a stool that [they] keep in [their] office."

The parties argued their competing theories to the jury. The state specifically challenged defendant's reliance on the tort-claim evidence to show the officers' bias, arguing both that the officers had not been aware that defendant

had filed the notice and that the notice was evidence of defendant's own bias. In his closing argument, the prosecutor asserted that, "The Defendant has bias and reason to change his testimony. The Defendant as you heard has filed a law suit against the officers and the employers involved in this case." Similarly, in his rebuttal argument, the prosecutor asserted, "The Defendant is also biased by that suit. The Defendant stands to gain financially should he win that suit. And, I'd ask you to keep that in mind and as you are allowed to do and instructed to do as part of your jury instructions[.]"

In his closing, defense counsel argued that defendant had not pointed the air rifle at the officers and that the jury should hold the officers responsible for the injuries and property damage they caused. Defense counsel challenged the credibility of the officers, pointing out inconsistencies in their testimony and asserting that, because of the tort-claim notice, they "have their own motive and bias." Defense counsel also challenged the state's evidence that defendant had been suicidal and its reconstruction.

The jury found defendant guilty of the four counts of menacing, and the trial court entered a judgment of a conviction and sentence, which defendant appeals.

## II. ANALYSIS

On appeal, defendant raises a single assignment of error, asserting that the trial court erred by denying his pretrial motion regarding the evidence of the use-of-force policies, specifically, the Coos County Sheriff's policy.[4] In response, the state asserts that (1) defendant did not preserve his appellate argument, (2) the court did not err in denying the motion, and (3) even if the court did err, the error was harmless.

---

[4] The Coos County Sheriff's Office's use-of-force policy provides, in part:

"Deadly force may be used only when a deputy sheriff reasonably believes that the action is in defense of human life, including the deputy's own life, or in defense of any person in imminent danger of serious physical injury or death.

"The objective of the use of deadly force is to render that person incapable of continuing the activity which required the use of that deadly force."

## A. *Preservation*

At the outset, we conclude that defendant preserved his appellate argument. As described above, defendant filed a written motion regarding the evidence at issue, explained his theory of relevance to the trial court, and obtained a ruling on the motion. 287 Or App at 545-47. That was sufficient to preserve the argument for appeal. *State v. Walker*, 350 Or 540, 548, 258 P3d 1228 (2011) (the purposes of preservation are to give the opposing party an opportunity to respond to, and the trial court to rule on, a contention).[5]

## B. *Admissibility*

Regarding the merits of the argument, we conclude that the trial court erred in excluding the evidence. Evidence that supports an inference that a witness has a motive to make certain statements is relevant to show the witness's bias or self-interest:

> "A party is entitled to impeach a witness with evidence regarding the witness's bias or interest. *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984); *State v. Nguyen*, 222 Or App 55, 60, 191 P3d 767 (2008), *rev den*, 345 Or 690 (2009). As the Supreme Court has observed, it is 'always permissible' to show the bias or interest of a

---

[5] In his dissent, Judge Armstrong argues that defendant's appellate argument is unpreserved. 287 Or App at 561 (Armstrong, J., dissenting). He asserts that the trial court did not make the ruling that defendant challenges on appeal because the ruling only excluded the policies themselves. 287 Or App at 560-61 (Armstrong, J., dissenting). That is incorrect because, as noted above, the trial court's ruling was categorical; that is, it excluded the subject matter of the policies, and the parties understood it as such. 287 Or App at 547 n 2.

Judge Armstrong also asserts that defendant did not seek to have the use-of-force-policy evidence admitted as impeachment evidence. We disagree. As recounted above, 287 Or App at 545-47, in his pretrial motion regarding the use-of-force-policy evidence and in his oral argument in support of that motion, defendant asserted that the use-of-force-policy evidence was relevant to whether the charges against him were fabricated. In the motion he wrote that the evidence was relevant to the jury's determination of "whether [he] in fact menaced the officers, *or whether the charges were filed as a means to justify the use of deadly force by the officers*," and he orally argued that his theory was that the officers "*made a claim that [defendant] was threatening them with a firearm when [he] was not, to justify their use of force in this case.*" (Emphasis added.) The way that the use-of-force policies are relevant to whether the officers *fabricated* their allegations against defendant is as *motive* evidence, that is, impeachment evidence.

witness because such evidence goes to the witness's credibility. *Hubbard*, 297 Or at 796 (internal quotation marks omitted). That observation is in keeping with the principle that 'the jury is entitled to hear all the facts relating to the possible bias and self-interest of the witness.' *State v. Sheeler*, 15 Or App 96, 100, 514 P2d 1370 (1973). Thus, '[u]nless there is reason to exclude [evidence of bias or interest], it must be received.' *State v. Prange*, 247 Or App 254, 263-64, 268 P3d 749 (2011). A party is entitled to make an 'initial showing of [a witness's] bias or interest.' *Hubbard*, 297 Or at 798 (internal quotation marks omitted). Only after a party has made such a showing does a trial court have the discretion to exclude additional evidence of bias or interest on the ground, for example, that it is cumulative. *Id.*"

*State v. Valle*, 255 Or App 805, 809-10, 298 P3d 1237 (2013) (brackets in *Valle*). Consequently, as the Supreme Court has held:

"The discretion of the trial judge to exclude evidence relevant to bias or interest only obtains once sufficient facts have been established from which the jury may infer that bias or interest. Typically, this would require wide latitude be given to the cross-examiner to ask and receive answers to questions sufficient to demonstrate to the jury the nature of the bias or interest of the witness."

*Hubbard*, 297 Or at 798. "That is particularly true for a defendant in a criminal case, who has the right, under both the state and federal constitutions, to confront witnesses, a right that includes the right to question a witness about circumstances from which a jury could reasonably infer that the witness has a motive to testify in a certain manner." *Valle*, 255 Or App at 810; *see* US Const, Amend VI; Or Const Art I, § 11; *Davis v. Alaska*, 415 US 308, 318, 94 S Ct 1105, 39 L Ed 2d 347 (1974) (trial court violated youth's Sixth Amendment right to confront witnesses by prohibiting youth from impeaching witness with evidence that witness was on probation); *State v. Najibi*, 150 Or App 194, 204, 945 P2d 1093 (1997), *rev den*, 326 Or 464 (1998) (defendant had a constitutional right to impeach witness with evidence that witness had a motive to curry favor with the state).

Like any other type of evidence, evidence of a witness's bias or interest is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401 (defining "relevant evidence"). The threshold for establishing that evidence is relevant is "very low." *State v. Hampton*, 317 Or 251, 255 n 8, 855 P2d 621 (1993). "To be relevant, evidence introduced to impeach a witness for bias or interest need only have a *mere tendency* to show the bias or interest of the witness." *Hubbard*, 297 Or App at 796 (emphasis added); *see Najibi*, 150 Or App at 203 ("It is error for the trial judge to exclude evidence that establishes sufficient facts from which bias or interest of a witness *may be inferred.*" (Emphasis added.)).

Evidence of bias or interest includes evidence that a witness has a personal motive for stating that he or she took certain action, such as to remain in good standing with an employer. For example, in *Hubbard*, the Supreme Court held that, in a criminal prosecution arising from a confrontation between the defendant and a police officer, evidence of the officer's knowledge of his police department's internal procedures was relevant "to show that the officer has an interest in testifying that he followed such procedures, whether he in fact did so." 297 Or at 801. The court further held that there was no ground to exclude the evidence and that excluding it was harmful because "the jury was not fully informed of matters affecting the credibility of the police officer witness." *Id.* at 802. *See also State v. Knobel*, 97 Or App 559, 567, 777 P2d 985 (1989), *rev den*, 309 Or 522 (1990) (trial court erred by excluding evidence that witness's employer was hostile toward defendant and the error was not harmless because it "den[ied] the jury an adequate opportunity to assess [the witness's] credibility").

In this case, the evidence of the use-of-force policies was relevant to whether the officers involved in the shooting had a personal interest in providing a particular version of events. As in *Hubbard*, it supported an inference that the officers had an interest in stating that they complied with the policies, whether they in fact did so. Consequently,

defendant was entitled to introduce the evidence to make an initial showing of the officers' bias, and the trial court erred in excluding it.[6]

## C. *Harmlessness*

Having concluded that the trial court erred by excluding the use-of-force-policy evidence, we turn to the question of whether the error was harmless. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (an error is harmless only if there is "little likelihood that the error affected the verdict").[7]

Erroneous exclusion of evidence of a witness's bias or personal interest is not harmless if, as a result of the exclusion, the jury is "not fully informed of matters relevant to an assessment of [the witness's] credibility[.]" *Valle*, 255 Or App at 815; *see also Hubbard*, 297 Or at 800 (erroneous exclusion of impeachment evidence "is reversible if it denies the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial") (citing *Alford v. United States*, 282 US 687, 692, 51 S Ct 218, 75 L Ed 624 (1931) ("It is the essence of a fair trial that reasonable latitude be given the cross-examiner * * *. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.")).

A witness may have multiple motivations for testifying to particular facts, and "[a]dmission of evidence of one

---

[6] The state argues that the trial court did not err because it did not "abuse its discretion" when it excluded the evidence. That argument is unavailing for two reasons: (1) the trial court did not exercise its discretion, it ruled that the evidence was inadmissible as a matter of law because it had "no bearing" on the case, and (2) the trial court had no discretion to exclude the evidence because defendant was entitled to make an initial showing regarding the particular employment-related motive that the officers had for stating that defendant had menaced them. *See Hubbard*, 297 Or at 798 ("The discretion of the trial judge to exclude evidence relevant to bias or interest only obtains once sufficient facts have been established from which the jury may infer that bias or interest.").

[7] When determining whether evidentiary error is harmless, "we do not weigh the evidence or act as factfinder[.]" *State v. Marquez-Vela*, 266 Or App 738, 746, 338 P3d 813 (2014). "The correct focus" is "on the possible influence of the error on the verdict rendered, not whether this court, sitting as a fact-finder, would regard the evidence of guilt as substantial and compelling." *Davis*, 336 Or at 32.

type of bias does not render exclusion of evidence of another type of bias harmless." *State v. Hernandez*, 269 Or App 327, 333-34, 344 P3d 538 (2015) (exclusion of evidence that complainant had an immigration reason for testifying against defendant was not harmless, even though there was evidence that complainant also had a financial reason for testifying against defendant); *see also State v. Miller*, 272 Or App 737, 746-47, 358 P3d 301 (2015) (evidence that complainant had numerous strong reasons to be angry with defendant did not render harmless the erroneous exclusion of evidence that complainant had physically attacked defendant, because the excluded evidence showed that complainant was actually angry with defendant and willing to use physical force against him); *State v. Nacoste*, 272 Or App 460, 470, 356 P3d 135 (2015) (admission of evidence that victim had one motive to accuse defendant—*viz.*, because she was angry with him—did not render harmless the erroneous exclusion of evidence that victim had a second motive to do so—*viz.*, to curry favor with the state).

Here, we conclude that the trial court's exclusion of the use-of-force policy evidence was not harmless; it deprived defendant of the opportunity to present evidence relevant to the jury's assessment of the credibility of the officers whose testimony was central to the state's case. As defendant asserted to the trial court when arguing his pretrial motion regarding the policies, the policies were relevant to the jury's determination of whether the officers "made a claim that [defendant] was threatening them with a firearm, when [he] was not, to justify their use of force in this case." The policies were evidence of a particular motivation, and because the trial court excluded them, the jurors did not hear "all the facts relating to the possible bias and self-interest of the [officers]," *Sheeler*, 15 Or App at 100. Consequently, the jurors were not "fully informed of matters relevant to an assessment of [the officers'] credibility[.]" *Valle*, 255 Or App at 815. Therefore, the exclusion of the policies was not harmless.

In his dissent, Judge Egan argues otherwise, for two reasons. First, he argues that the exclusion of the use-of-force evidence was harmless because the evidence was cumulative. 287 Or App at 570, 572-73 (Egan, J., dissenting).

Second, the dissent argues that the exclusion of the evidence was harmless because it was corroborated. 287 Or App at 572-73 (Egan, J., dissenting). We address those arguments in turn.

Judge Egan bases his arguments on the Supreme Court's statement in *State v. Titus*, 328 Or 475, 482, 982 P2d 1133 (1999), identifying two circumstances in which the exclusion of evidence of a witness's bias or motive can be harmless:

> "[U]nder *Hubbard*, the trial court's error * * * would be harmless if either: (1) despite the exclusion, the jury nonetheless had an adequate opportunity to assess [the witness's] credibility; or (2) [the witness's] credibility was not important to the outcome of the trial."

287 Or App at 570, 572-73 (Egan, J., dissenting). In his dissent, Judge Egan argues that both circumstances are present in this case. For the reasons that follow, we disagree.

First, Judge Egan's dissent argues that the jury had an adequate opportunity to assess the officers' credibility because the trial court admitted evidence that defendant had filed a tort-claim notice. 287 Or App at 570-73 (Egan, J., dissenting). According to the dissent, the use-of-force-policy evidence was cumulative of the tort-claim evidence. *Id.* at 571. That is incorrect. The use-of-force-policy evidence and the tort-claim evidence were qualitatively different. As explained below, the use-of-force-policy evidence was different, stronger, more specific, and less subject to challenge than the tort-claim evidence.

First, the use-of-force-policy evidence was *different* from the tort-claim evidence. Although both were offered to show that the officers were motivated to claim that defendant raised and pointed the air rifle, they concerned different motivations. The use-of-force-policy evidence was relevant to whether the officers had a motive to testify in a certain way in order to protect themselves from adverse employment consequences, whereas the tort-claim evidence was relevant to whether the officers had a motive to testify in a certain way in order to protect themselves from tort liability. As noted, exclusion of evidence of one motive is not rendered harmless by the admission of evidence of a

different motive. *Hernandez*, 269 Or App at 333-34; *Miller*, 272 Or App at 746-47; *Nacoste*, 272 Or App at 470. That is, in part, because a jury could infer that the more reasons a person has to engage in particular conduct, the more likely it is that the person will engage in that conduct. Thus, in this case, the use-of-force-policy evidence strengthened defendant's case in a different and additional way than the tort-claim evidence.

Second, the use-of-force-policy evidence was *stronger* than the tort-claim evidence, because the threat of negative repercussions from violation of the policy was more obvious and immediate than the threat from a tort claim that had not been filed, and might not ever be filed. It also was more personal, because, as the prosecutor suggested, the officers could be immune from tort liability.[8] Thus, the state could argue that the officers' statements after the incident were unlikely to be affected by the possibility of a future tort claim, from which they might be immune. But, it could not make the same argument with respect to the possibility of an employment investigation, which actually occurred shortly after the incident and which could have jeopardized the officers' careers.

Third, the use-of-force-policy evidence was more *specific*. The policy contains a standard for using force, and a jury could infer that the officers had an incentive to describe their conduct as having conformed to that standard.[9] In contrast, there was no standard identified for tort liability for the officers, so the jury could not determine what specific effect the possibility of tort liability might have on the officers' testimony.

Fourth, and perhaps most importantly, the use-of-force-policy evidence *was not subject to the same attack* that

---

[8] As described, the prosecutor objected to the admission of the tort-claim evidence on the ground that it was not bias evidence because the officers could not be held personally liable.

[9] As noted, the use-of-force policy provides that an officer may use deadly force only when the officer "reasonably believes that the action is in defense of human life, including [the officer's] own life, or in defense of any person in imminent danger of serious physical injury or death." Thus, an officer subject to the policy who was being investigated for using deadly force would have a reason to testify that he or she did so in response to a threat of imminent death or serious physical injury.

the state made against the tort-claim evidence. As the trial court observed, the tort-claim evidence was a double-edged sword: a jury could use it to conclude, as defendant urged, that the officers had a financial reason to make the statements they did, but the jury could also use it to conclude, as the state urged, that defendant himself had a financial reason for making the statements he did. Indeed, that was how the state effectively neutralized the tort-claim evidence.[10] The state would not have been able to do the same thing against the use-of-force-policy evidence; again, the use-of-force policy evidence was evidence from which the jury could infer that the officers had a personal motive to make certain statements, regardless of the possibility of any tort claim.

In sum, the use-of-force-policy evidence was qualitatively different from the tort-claim evidence; it was important evidence that would have provided separate and better support for defendant's theory. The exclusion of it prejudiced defendant because it denied him the opportunity "to place the witness[es] in [their] proper setting and put the weight of [their] testimony and [their] credibility to a test, without which the jury cannot fairly appraise them." *Alford*, 282 US at 692.

Judge Egan's contrary conclusion is based on his view that defendant had a single purpose in offering the use-of-force-policy evidence and the tort-claim evidence. According to the dissent, defendant offered the use-of-force-policy evidence to show that the officers had a motive to lie to avoid tort liability. 287 Or App at 571 (Egan, J., dissenting). The record does not support the dissent's blurring of the two types of evidence, which, as described above, were the subject of separate pretrial motions, separate arguments by the parties, and separate ruling by the trial court. 287 Or App at 545-47. Defendant specifically asserted in his pretrial motion regarding the use-of-force-policy evidence

---

[10] As set out above, the state argued, "The Defendant has bias and reason to change his testimony. The Defendant as you heard has filed a law suit against the officers and the employers involved in this case," and the state also argued, "The Defendant stands to gain financially should he win that suit. And, I'd ask you to keep that in mind and as you are allowed to do and instructed to do as part of your jury instructions[.]" 287 Or App at 550.

that the evidence was relevant to the jury's determination of "whether [he] in fact menaced the officers, or whether the charges were filed as a means to justify the use of deadly force by the officers." That is, he asserted that the evidence that was the subject of that particular motion was relevant to an assessment of whether the officers had fabricated their allegations that he menaced them in order to justify their use of deadly force.

In arguing that the use-of-force-policy evidence was offered only to show that the officers were motivated to avoid tort liability, Judge Egan's dissent relies on defendant's pretrial motion regarding the tort-claim evidence, in which defendant asserted that the tort-claim evidence was admissible "to show the jury that the officers have an interest or bias in claiming that the defendant had menaced them, since, if true, that would defeat the civil lawsuit." 287 Or App at 571 (Egan, J., dissenting). The dissent's reliance on defendant's assertion in his motion regarding the tort-claim evidence is misplaced. As explained, defendant filed separate motions regarding the use-of-force-policy evidence and the tort-claim evidence, and the motions were addressed separately by the parties and the trial court.

Having concluded that, contrary to Judge Egan's argument, the jury did not have an adequate opportunity to assess the officers' credibility, we turn to his assertion that the second circumstance identified in *Titus* is present in this case. To repeat, in *Titus*, the Supreme Court stated:

> "[U]nder *Hubbard*, the trial court's error * * * would be harmless if either: (1) despite the exclusion, the jury nonetheless had an adequate opportunity to assess [the witness's] credibility; or (2) [the witness's] credibility was not important to the outcome of the trial."

328 Or at 482. Regarding the second circumstance, the dissent acknowledges, as it must, "that the credibility of the four officers was important to the outcome of the trial." 287 Or App at 572 (Egan, J., dissenting). That acknowledgement should end the matter. The officers' testimony (and, therefore, their credibility) was central to the state's case. Indeed, in his closing argument, the prosecutor emphasized that

"[t]here were five eyewitnesses * * * to this event, the four officers and [defendant]," and then argued that the officers were more credible than defendant.

Judge Egan's dissent contends that we do not address the second circumstance identified in *Titus* and that we should focus on whether the officers' testimony was corroborated. 287 Or App at 573 (Egan, J., dissenting). That is incorrect. The question under *Titus* is whether the officers' credibility was "not important to the outcome of the trial." Evidentiary error is harmless only when there is little likelihood that it affected the verdict. *Davis*, 336 Or at 32. When a witness's credibility is important to the outcome of a trial, the erroneous exclusion of evidence of that witness's motives or biases is not harmless, regardless of whether the witness's testimony is corroborated. *Hubbard*, 297 Or at 800 (erroneous exclusion of impeachment evidence "is reversible if it denies the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial").

It may be that, in some cases, the credibility of a witness will not be important because there is overwhelming evidence regarding the facts to which the witness testified, but this is not such a case. In arguing that the exclusion of the use-of-force-policy evidence was harmless, Judge Egan's dissent relies on the state's evidence of the statements defendant made, the photographs near his bed, and the reconstruction. 287 Or App at 573 (Egan, J., dissenting). But that evidence was far from overwhelming. It did not render the officers' testimony unimportant. It was subject to different interpretations and contested at trial. As described above, defendant challenged the state's evidence regarding whether he had been suicidal and whether he had pointed the air rifle, and he also presented his own evidence on those issues. 287 Or App at 548-49.

In sum, we conclude that defendant preserved his challenge to the trial court's exclusion of the use-of-force-policy evidence, the trial court erred in excluding the evidence, and the error was not harmless.

Reversed and remanded.

**ARMSTRONG, J.,** dissenting.

Defendant assigns as error the trial court's exclusion of police department use-of-force policy orders based on his argument that those policies were relevant to show the officers' bias. However, in my view, defendant's argument on appeal misapprehends the scope of the trial court's ruling. The trial court's ruling—which is the only ruling to which defendant assigns error—was narrowly focused on defendant's bare pretrial request to admit the use-of-force policy orders themselves, presumably as exhibits to be used at trial. Defendant did not attempt to admit evidence of the officers' knowledge of the use-of-force policies or evidence that the officers had a motive to testify about their conduct in a manner that comported with those policies, and, consequently, the trial court never made a ruling preventing defendant from doing that. As a result, defendant's arguments on appeal are not directed at any ruling that the trial court actually made, and I would affirm. Accordingly, I dissent.

The majority and Judge Egan's dissent adequately relate the facts of this case, so I do not repeat them here. Instead, I focus on the pretrial proceedings that resulted in the ruling that defendant challenges on appeal.

Before trial, defendant filed a "motion to admit use of force policies." In that motion, defendant requested an order from the court

"allowing evidence of the Coos County Sheriff's Office General Order 4.03 on 'Use of Force' effective 5/01/09, as revised or updated at any later date, and the 'Less Lethal Policy,' General Order 4.04 effective 5/01/09, as revised or updated at any later date, as well as any comparable policy or directive of the Bandon Police Department."

His stated ground for the motion was that

"[i]t would be important for the jury to know whether these multiple [firearm] discharges were in compliance with the policies of the applicable department in determining whether the defendant in fact menaced the officers, or whether the charges were filed as a means to justify the use of deadly force by the officers."

Thus, defendant only requested that the trial court enter an order admitting the identified policies themselves for

use as direct evidence in the menacing case against defendant. Notably, defendant did not seek in his written motion to admit the policies as impeachment evidence. Defendant's failure to make such a request was in stark contrast to his motion *in limine* to admit evidence of his tort claim notice against the public entities that employed the officers. In that motion, defendant specifically argued that the evidence of the tort claim notice was admissible "to show the jury that the officers have an interest or bias in claiming that the defendant had menaced them, since if true, that would defeat the civil lawsuit."

The state's response to defendant's motion to admit the use-of-force policies also was focused on the admissibility of the policies themselves because that is what defendant requested. The state argued that the policies were irrelevant to whether defendant had menaced the officers because that crime requires proof of defendant's state of mind and not the officers' state of mind. The state also argued that, to the extent defendant would seek to use the policies as impeachment evidence (although defendant did not make that request), the policies were irrelevant and unfairly prejudicial because the applicable standard for the use of deadly force is statutory and not contained in the policies.

At an omnibus hearing, the trial court took up defendant's motion to admit the use-of-force polices, asking if any party had testimony relevant to that motion, but neither defendant nor the state did. The trial court then engaged in the following colloquy with defendant:

"THE COURT:   *** what does the State's [*sic*] use of force policies have to do with the question of whether or not the Defendant was guilty of menacing? Because wouldn't the use of force policies indicate simply issues relating to the police's response to his claimed menacing?

"[Defendant]:   Correct. And, our position would be that it was an overreaction or over—non[-]authorized response.

"THE COURT:   So, in that context he menaced them less somehow, if he did it at all?

"[Defendant]:   Our position would be he didn't menace them at all.

"THE COURT:   So then the use of force policies have nothing to do with it?

"[Defendant]:   Right. But they should not be allowed to use any force.

"THE COURT:   But that is never the question in this case. The question isn't how much force the police used or anything of that nature. The question is, did your client menace anybody? Unless he's going to claim he was menacing people in self-defense?

"[Defendant]:   No.

"THE COURT:   Okay.

"[Defendant]:   He'll say there was no menacing whatsoever.

"THE COURT:   Okay. So, I don't see how the use of force policies have any bearing on the case at all.

"Do you have any other argument?

"[Defendant]:   I think it kind of ties in with our related argument regarding the civil suit that they did in fact violate the use of force policies in this situation and—

"THE COURT:   (Interposing) But, we're not going to try the civil case here.

"[Defendant]:   Correct. I am—well, I understand that. That—as—there's going to be a claim that [defendant] menaced them to justify the use of force. That's essentially the story.

"THE COURT:   So, they made up a story, phonied up a call to 9-1-1 so they could go shoot him?

"[Defendant]:   Negative. Or rather, it was more that they made a claim that [defendant] was threatening them with a firearm when [defendant] was not, to justify their use of force in this case.

"THE COURT:   But that's still a question this jury will never get to because if they agree with him that he didn't menace anybody, they find him not guilty and we're done. So, [the] use of force question has no bearing on it.

"Anything else?

"[Defendant]:   That's the only—all the argument that I have, Your Honor.

"THE COURT: I'll deny the motion to admit use of force policies."

As demonstrated by the colloquy with the court, and in conformance with his written motion, defendant sought to admit the policies themselves as direct evidence that defendant did not, in fact, menace the officers, based on a theory that the officers only brought the charges against defendant to justify their use of force.

In denying defendant's motion to admit the use-of-force policies, the trial court was thus denying defendant's request to admit the policies themselves as evidence in the case. The court's written order confirms that that is what the trial court understood it was doing. That written order succinctly stated: "Defendant's Motion to Admit Use of Force Policies: DENIED."

On appeal, defendant argues that the trial court erred because the use-of-force polices were relevant to impeach the truthfulness of the officers' testimony. In particular, defendant argues that the trial court's ruling prevented him from exploring at trial whether the officers had a motive to testify dishonestly to avoid an unreasonable-use-of-force claim. The difficulty with defendant's argument is that it misapprehends what the trial court ruled below. As set out at length above, the trial court denied only defendant's attempt to admit the use-of-force policies themselves as direct evidence in the menacing case. Defendant never requested that the trial court allow him to use the policies in an effort to impeach the officers' testimony (as opposed to admitting the policies themselves)—*viz.*, defendant never attempted to question the officers about their knowledge of the policies or the consequences that they might face if they violated the policies—and never made an attempt to supply an adequate foundation for admission of the policies themselves as impeachment evidence. As a result, the trial court never made a ruling that prohibited defendant from doing those things. Seeking pretrial to admit the use-of-force policies as evidence is a substantively different request from seeking to impeach witness testimony through questioning that is based on the policies. Because the trial court never

made the ruling that defendant now seeks to challenge on appeal, I would affirm.

Accordingly, I dissent.

**EGAN, J.,** dissenting.

Defendant appeals a judgment of conviction of four counts of menacing, assigning error to the trial court's exclusion of evidence of the Coos County Sheriff's Office's and Bandon Police Department's use-of-force policies. For the reasons explained below, I would conclude that, even if the trial court erred in excluding that evidence, the error was harmless. Therefore, I respectfully dissent.

Because I believe the majority omits key facts from the historical and procedural background in this case, I recount them here.

On December 25, 2013, defendant called 9-1-1 for medical assistance. He requested an ambulance because his "health was deteriorating." Officer Garrett of the Bandon Police Department was the first to arrive at defendant's residence, which was a trailer located in a wooded area. To reach defendant's trailer, Garrett drove down a narrow dirt road—about one vehicle wide—that opened up to four trailers. When he was close to the first trailer, he stopped his patrol car. At that point, Garrett attempted to notify dispatch that he was at defendant's trailer; however, he had no reception.

Garrett then stepped out of his patrol car and noticed that defendant was standing to the left of the first trailer and was holding a "shiny, silver object." Garrett identified himself as "Officer Garrett, Bandon Police Department," and defendant turned around and walked away. Garrett retreated to his patrol car. He backed out of the dirt road "several hundred yards" to an area where he was able to get reception, called dispatch, described what he had observed, and requested backup.

While Garrett waited for backup to arrive, defendant called 9-1-1 again and told the dispatcher:

"All the sudden the cops showed up.

"* * * * *

"I'm sorry they're not supposed to be here. I wanted an ambulance.

"* * * * *

"* * * If I die tonight, it's on you."

Dispatch then called Garrett to report that defendant had called 9-1-1 again, "wanting to know why the police had responded when he asked for an ambulance." By that time, the ambulance had arrived, as well as Coos County Sheriff's deputies Mitchell and Wilson, and Bandon Police Department Officer Byrd. Mitchell ran a records search on defendant and discovered that defendant had an outstanding arrest warrant.

Garrett, Mitchell, Wilson, and Byrd then drove down the dirt road toward defendant's trailer in two patrol cars. The officers stopped their patrol cars about 300 yards from the clearing where the trailers were located and started to walk toward defendant's trailer armed with tactical rifles. Mitchell and Wilson knocked on defendant's trailer door, and no one answered. There were no lights on in defendant's trailer. Smith, defendant's neighbor, came out of his trailer and told Mitchell that he believed that defendant had walked away on foot.

As the officers were getting ready to leave, Garrett heard noises coming from defendant's trailer. Garrett alerted Mitchell, and Mitchell turned toward defendant's trailer. The trailer door swung open and the officers saw that defendant was holding what they believed was a rifle; it is undisputed that defendant was actually holding an air rifle that shoots pellets. Garrett testified that he saw "a person standing there and the barrel of a rifle come up"—"as soon as the door came open I could see the gleam of [the] barrel." Mitchell testified that when the door opened he saw that defendant was holding a rifle in his right hand. Mitchell commanded defendant several times to drop his weapon. Instead, defendant "started to point the rifle up as to aim or as you would hold it with both hands" towards Mitchell. All

four officers fired their weapons at defendant. Defendant did not fire a single shot.

After the firing stopped, Mitchell asked defendant if he was hit, and defendant responded, "Yeah, I'm hit." Defendant had been shot in the right arm and the hat he had been wearing had a bullet hole through it. The officers arrested defendant and put him in the ambulance. Byrd rode with defendant in the ambulance to the hospital. Defendant asked Byrd "why [the officers] shot him in the arm" and told Byrd that he should have shot him "right here" and pointed to his forehead.

Karcher, a deputy medical examiner and forensic nurse, examined defendant at the hospital. Karcher described defendant's arm injury as a "graze type gunshot wound" underneath his right forearm and a direct gunshot wound that resulted in a "big avulsion" in the right bicep of defendant's arm—"[t]he bullet went through the skin, came out the other side, and then it went in the arm again." After Karcher examined defendant's injuries, she participated in an attempt with Detectives Schwenninger and Sparks to reconstruct the trajectory of the bullet that hit defendant. Through that reconstruction, they found that the "slight upward direction, trajectory" of the bullet angle indicated that defendant's arm had been raised to a "level" shooting position at the time that he was shot.

Smith, who was in a neighboring trailer at the time of the shooting, told Schwenninger that he had spoken with defendant earlier that day and defendant had told him that he would rather die than be there right now. Smith also said that defendant is usually "happy-go-lucky," but, on the night of the incident, he was in a lot of pain.

The following day, detectives investigated the crime scene at defendant's trailer. Detectives discovered that the officers had fired more than 50 rounds of ammunition into defendant's trailer. Detectives also found a collection of photographs in defendant's trailer, which Karcher believed could have been a "shrine" made in preparation for committing suicide. The state charged defendant with four counts of menacing, ORS 163.190.

Before trial, defendant moved to admit evidence of the "Coos County Sheriff's Office General Order 4.03 on 'Use of force' effective 5/01/09," "General Order 4.04 effective 5/01/09," and "any comparable policy or directive of the Bandon Police Department."[1] Defendant explained:

"It would be important for the jury to know whether these multiple discharges were in compliance with the policies of the applicable department in determining whether the defendant in fact menaced the officers, or whether the charges were filed as a means to justify the use of deadly force by the officers."

The state responded that the use-of-force policies were irrelevant under OEC 401[2] and were not admissible "as impeachment evidence against the testifying officers to show that they have motive for being untruthful." At a pretrial hearing, the trial court denied defendant's motion to admit the use-of-force policies and explained that the use-of-force question had "no bearing" on whether defendant menaced the officers. The trial court and defense counsel had the following exchange at the hearing:

"[THE COURT]:   So, I don't see how the use-of-force policies have any bearing on the case at all.

"* * * * *

"[DEFENSE COUNSEL]:   I think it kind of ties in with our related argument regarding the civil suit that [the officers] did in fact violate the use of force policies in this situation * * *.

"[THE COURT]:   * * * But, we're not going to try the civil case here.

---

[1] The Coos County Sheriff's Office use-of-force policy provides, in pertinent part:

"Deadly force may be used only when a deputy sheriff reasonably believes that the action is in defense of human life, including the deputy's own life, or in defense of any person in imminent danger of serious physical injury or death.

"The objective of the use of deadly force is to render that person incapable of continuing the activity which required the use of that deadly force."

[2] OEC 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"[DEFENSE COUNSEL]: Correct. * * * I understand that * * * there's going to be a claim that [defendant] menaced them to justify the use of force. That's essentially the story.

"[THE COURT]: So, they made up a story, phonied up a call to 9-1-1 so they could go shoot him?

"[DEFENSE COUNSEL]: Negative. Or rather, it was more that they made a claim that [defendant] was threatening them with a firearm when [defendant] was not, to justify their use of force in this case.

"[THE COURT]: But that's still a question this jury will never get to because if they agree with him that he didn't menace anybody, they find him not guilty and we're done. So, use of force question has no bearing on it."

Thus, the trial court found that the use-of-force policies were not relevant.

Before trial, defendant also filed a motion to allow evidence that "defendant ha[d] retained counsel for filing a civil lawsuit against the State, its various subdivisions and agencies, as well as the four individual officers, and that the counsel ha[d] filed a Tort Claim Notice under ORS 30.275 as a step in pursuit of the lawsuit." Defendant explained that "[t]his evidence is admissible as a basis to show the jury that the officers have an interest or bias in claiming that the defendant had menaced them, since, if true, that would defeat the civil lawsuit." The state argued that that evidence did not go to bias "because the departments have already determined, at least for their purposes and thus for purposes of indemnification, that the officers acted in a justified manner." The trial court disagreed with the state and granted the motion to admit that evidence as evidence of bias with the limitation that it be used only "[t]o the extent that * * * [defendant] sent them a tort claim and consulted with a lawyer. And that's been made known to [the officers'] respective employing jurisdictions."

At trial, the state presented a theory that defendant had attempted to commit "suicide by cop." To support that theory, the state relied on defendant's 9-1-1 call warning the operator "[i]f I die tonight, it's on you," defendant's statement in the ambulance that the police should have shot him in

the head, and the potential suicide "shrine" found in defendant's trailer. All four officers also testified that defendant had pointed the air rifle at Mitchell before they fired their weapons. The state presented evidence that defendant's testimony had been inconsistent and that he had had a reason to change his testimony after consulting with a lawyer about his tort claim and sending the tort claim notice to the officers' employers. Defendant testified that, at the time he was shot, the pellet gun he was holding was "[f]acing the floor" and that "[i]t might have been coming up just a little bit." Defendant's counsel refuted the state's "suicide by cop" theory by, among other things, pointing out the inconsistency of that theory with defendant calling 9-1-1 for medical help.

Defendant was convicted by a jury of all four counts of menacing. On appeal, he challenges the trial court's exclusion of the use-of-force policies as evidence of the involved officers' bias or interest. Defendant contends that "[t]he use-of-force policy was admissible to impeach the truthfulness of the officers' testimony with their motive to avoid a civil lawsuit." On the merits of that argument, I would conclude that any error committed by the trial court in excluding that evidence was harmless and affirm. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003); *see also* OEC 103 (evidentiary error is not reversible "unless a substantial right of the party is affected").

The Supreme Court has stated that a trial court's "decision to exclude evidence relevant to bias or interest which is error, is reversible if it denies the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial." *State v. Hubbard*, 297 Or 789, 800, 688 P2d 1311 (1984). "Thus, under *Hubbard*, the trial court's error * * * would be harmless if either: (1) despite the exclusion, the jury nonetheless had an adequate opportunity to assess [the witness's] credibility; or (2) [the witness's] credibility was not important to the outcome of the trial." *State v. Titus*, 328 Or 475, 482, 982 P2d 1133 (1999).

With regard to whether the jury had an adequate opportunity to assess the officers' credibility, here, the jury heard evidence of possible officer bias against defendant

in that defendant had retained an attorney to file a civil action against the state agencies and officers, and that that information was made known to the officers' respective employers. That evidence, as defendant argued in his pretrial motion, was admissible "to show the jury that the officers have an interest or bias in claiming that the defendant had menaced them, since, if true, *that would defeat the civil lawsuit*." (Emphasis added.) Similarly, at the pretrial hearing on defendant's motion, defendant argued that the use-of-force policies were admissible because they "kind of tie[d] in with [defendant's] related argument regarding the *civil suit that [the officers] did in fact violate the use of force policies in this situation*." (Emphasis added.) Defendant also argued in his pretrial motion that the use-of-force policies were admissible because

> "[i]t would be important for the jury to know whether these multiple discharges were in compliance with the policies of the applicable department in determining whether the defendant in fact menaced the officers, or whether the charges were filed as a means to justify the use of deadly force by the officers."

Thus, defendant sought to admit the use-of-force evidence to establish the officers' bias based on the same theory of bias as the evidence of the civil lawsuit, *viz.*, that the officers had a motive to lie to avoid liability for excessive use-of-force as a basis for tort liability. As a result, the exclusion of the use-of-force evidence did not deprive the jury of the opportunity to evaluate the officers' bias that defendant alleged they held. Thus, I would conclude that the excluded use-of-force policies were cumulative of the evidence that was admitted at trial.

In coming to the opposite conclusion, the majority ignores the purpose for which defendant offered the use-of-force policies. Defendant argued that he sought to demonstrate the officers' bias based on the same theory for which he sought to admit the evidence of the tort claim notice— that is, the officers had a motive to lie or exaggerate because, if defendant was convicted of menacing the officers, then that would defeat the civil claim against the officers based on their use of excessive force against defendant. Based on that theory of the case, the use-of-force policies, which defendant sought to have admitted without any offer of proof of

any expected testimony, are not qualitatively different from defendant's tort claim notice.

The majority claims that the use-of-force policies were "relevant to whether the officers had a motive to testify in a certain way in order to protect themselves from adverse employment consequences," and thus were qualitatively different from the tort claims notice evidence. 287 Or App at 556. However, defendant never argued in the trial court that the use-of-force policies were relevant for that purpose, nor did he seek to put on an offer of proof that supported such an argument. In determining whether exclusion of evidence is harmless, I believe our role is to evaluate whether the erroneous exclusion of the evidence likely affected the jury's verdict based on the theories presented by the parties—not based on what we determine would have been a better theory to have presented to the trial court. Thus, I cannot agree with how the majority proceeds to evaluate whether exclusion of the use-of-force polices was harmless.

I recognize that the credibility of the four officers was important to the outcome of the trial. However, as discussed above, the excluded use-of-force evidence was not qualitatively different from the admitted evidence of the civil action, because the excluded evidence was offered to establish officer bias based on the same theory as the evidence of the civil lawsuit. Consequently, the excluded evidence was not qualitatively different from the admitted evidence in the type or strength of the officer bias that defendant sought to demonstrate. *Cf. State v. Valle*, 255 Or App 805, 815, 298 P3d 1237 (2013) (concluding that the trial court's exclusion of defendant's proffered impeachment evidence was not harmless because "the jury did not have information that was relevant to whether [the witness] had motive to fabricate her allegations against defendant"); *State v. Muldrew*, 229 Or App 219, 230, 210 P3d 936 (2009) (concluding that the trial court's exclusion of defendant's proffered impeachment evidence—the statement in the officer's report—was not harmless because it was the "crucial piece of evidence that the jury needed in order to evaluate [the officer's] credibility"). Thus, I would conclude that the jury had an adequate opportunity to assess the officers' credibility absent the consideration of evidence of the use-of-force policies.

In determining if exclusion of bias evidence is harmless, we are also required to consider whether the particular evidence regarding the officers' credibility was important to the outcome of the trial. *See Titus*, 328 Or at 482 (holding that, under *Hubbard*, a trial court's error in excluding bias evidence "would be harmless *if either*: (1) despite the exclusion, the jury nonetheless had an adequate opportunity to assess [the witness's] credibility; or (2) [the witness's] credibility was not important to the outcome of the trial" (emphasis added)). The majority does not address this necessary prong of the harmlessness analysis for bias evidence and thus fails to acknowledge that there was also evidence that corroborated the officers' testimony, which strengthens my conclusion that the exclusion of the use-of-force policies was harmless.

Here, there was evidence corroborating the four officers' testimony that defendant had intended to place the officers in fear of imminent serious physical injury. That evidence included undisputed evidence that defendant was holding an air rifle, and testimony by a medical examiner and two detectives that the bullet trajectory of defendant's right arm wounds indicated that defendant was holding the air rifle in his right arm in a "level" shooting position when the officers fired at him. The state also introduced evidence that corroborated the state's theory that defendant was suicidal at the time of the incident—defendant told Byrd in the ambulance that the officers should have shot him in the head, he told Smith that he was in pain and wanted to die, and the investigators found a potential suicide "shrine" in defendant's trailer.

In sum, despite the excluded evidence, the jury had an adequate opportunity to assess the credibility of the officers, and the officers' credibility was not solely determinative of the outcome of the trial. I would thus conclude that there is little likelihood that the exclusion of the use-of-force policies affected the verdict and would affirm. Accordingly, I dissent from the majority's opinion reversing defendant's convictions.

Hadlock, C. J., and Tookey, J., join in this dissent.