Argued and submitted November 21, 2017, reversed and remanded
October 23, 2019, petition for review allowed March 5, 2020 (366 Or 257)
See later issue Oregon Reports

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAMON JAMES NAUDAIN,
*Defendant-Appellant.*

Multnomah County Circuit Court
080432001; A160380

452 P3d 970

Defendant appeals from a judgment of conviction for aggravated murder with a firearm. At trial, defendant admitted to killing the victim during the course of a home-invasion robbery. Defendant, however, asserted that he had discharged his firearm accidentally and that he did not intend to kill the victim. On appeal, defendant, who is African American, argues that the trial court erred in excluding evidence that tended to show that a witness was racially biased against African Americans because that bias tended to show why the witness's recollection of events differed from defendant's recollection. Defendant also argues that the trial court erred in excluding, as demonstrative evidence, videos of police officers accidentally discharging handguns and evidence that the victim had methamphetamine in his system at the time of his death. *Held*: The trial court erred in excluding the evidence of racial bias, because the evidence was relevant to show the witness's bias and did not have the unfairly prejudicial effect argued by the state. In addition, that error was not harmless. The trial court also erred in excluding the two videos showing police officers accidentally discharging handguns. However, the trial court did not err in excluding the evidence that the victim had methamphetamine in his system, because that evidence was not relevant.

Reversed and remanded.

Thomas M. Ryan, Judge.

David O. Ferry, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Susan G. Howe, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Egan, Chief Judge, and Powers, Judge.*

ORTEGA, P. J.

Reversed and remanded.

_____

* Egan, C. J., *vice* Garrett, J. pro tempore.

**ORTEGA, P. J.**

Defendant appeals from a judgment of conviction for aggravated murder with a firearm. At trial, defendant admitted to killing the victim during the course of a home-invasion robbery. Defendant, however, asserted that he had discharged his firearm accidentally and that he did not intend to kill the victim. On appeal, he raises four assignments of error, challenging evidentiary rulings of the trial court that excluded evidence that defendant sought to introduce. In two assignments of error, defendant, who is African-American, argues that the trial court erred in excluding evidence that tended to show that a witness was racially biased against African-Americans because that bias tended to show why the witness's recollection of events differed from defendant's recollection. We conclude that the trial court erred in excluding that potential bias evidence and that the error was not harmless. We also address defendant's remaining assignments of error because they are likely to arise on remand and conclude that the trial court erred in excluding two short videos of police officers accidentally discharging firearms that defendant sought to introduce as demonstrative evidence, but that the trial court did not err in excluding evidence that the victim had methamphetamine in his system at the time of his death. Accordingly, we reverse and remand.

The relevant background facts are undisputed, except as described below. In 1998, defendant and five other individuals, after using methamphetamine, drove to a house in Southeast Portland to rob a methamphetamine dealer of drugs and cash. While two people remained in the car, defendant and three other men—Ronald James, Michael Jump, and Jason Turner—approached the house wearing hats that said "DEA" and holding two security badges. All of the men, except defendant, wore bandanas over their faces; defendant and two of the other men were armed with firearms and the fourth man was armed with a machete.

Once in front of the house, defendant unscrewed the front light and knocked on the door, yelling "police." Jump then kicked in the front door and all four of the men entered the house, yelling "police." James headed upstairs to bring

down an individual who was at the top of the stairs, and Turner remained downstairs with an individual who had been sitting on the living room couch. James, Turner, and their two hostages met at the bottom of the staircase, where they remained for the duration of the robbery.

Defendant and Jump, who were the first to enter the house, headed to the bedroom on the ground floor where defendant had been informed a safe was located that contained drugs and cash. Inside the bedroom was the victim, Jerry Hartman, along with his fiancé, Julie Beachell, and their infant son. It is undisputed that, while in the bedroom, defendant asked Hartman where the money and drugs were, that defendant shot and killed Hartman with a close contact shot to the head, and that defendant told Beachell to open the safe after shooting Hartman. It is also undisputed that Beachell opened the safe and that either defendant or Jump removed its contents—a plastic bag containing about $335. All four men then left the house. The entire sequence of events took only a few minutes.

The precise sequence of events in the bedroom that led to defendant shooting Hartman is disputed by the two testifying witnesses to those events—defendant and Beachell. Because the differing accounts are relevant to the evidentiary issues on appeal, we set forth both accounts.

Defendant testified that, after he asked Hartman where the money and drugs were and Hartman did not answer, "out of nowhere, [Jump] just lunged past me and hit [Hartman.]" Jump had also admitted in a statement to an investigator that he was the one who hit Hartman. Hartman fell, and defendant yelled "stay down" and "get your hand out from under the bed." At the same time, defendant was confused and turned to look at Jump, when he heard a "pop" and Hartman fell forward. Defendant testified that he was in shock and did not recall pulling the trigger, nor did he see where the bullet hit Hartman. Defendant saw Jump turning his attention to Beachell, so defendant told her that he would not hurt her and asked her to open the safe. Jump took her to the safe, she opened it, and Jump took its contents. Defendant also shouted "let's go, let's go" shortly after the shooting.

Beachell testified that Hartman took a Valium before bed and was asleep when the four men entered the house. Beachell woke Hartman up as two men busted through the bedroom door. One man was African-American—defendant—and one was white—Jump. Defendant was yelling for drugs and money and called Hartman a "fucking punk" and hit him. Jump was next to Beachell, who was holding her baby, and pointed his gun at her, but looked surprised. When defendant hit Hartman, he had his gun at Hartman's head, and Hartman fell back against the bed. Defendant then, in a "[v]ery threatening" tone, told everyone to get down on the floor. Beachell, who was on the opposite side of the bed, got down, at which point she could no longer see Hartman. She then heard a gunshot. Defendant then told her to open the safe. Beachell described defendant's demeanor during that time as "yelling and *** angry and terrifying." Jump took Beachell by the arm to the safe, which she opened. After defendant and Jump got the contents of the safe, defendant yelled "let's go." Beachell testified that defendant never told her not to worry or that he would not hurt her; that no one tried to leave until after the safe was opened; that the gun did not go off until after defendant told everyone to get on the floor; and that defendant was the one in charge, as he was the one who was yelling and demanding that the safe be opened. Jump, on the other hand, looked fearful, while defendant did not.

A few days after the robbery, defendant left for California and began using a different last name. In 2008, he was arrested in connection with the 1998 robbery and Hartman's death. This appeal comes to us after a retrial of the case against defendant, following a reversal and remand of the judgment of conviction entered against defendant after the first trial. *State v. Naudain*, 254 Or App 1, 292 P3d 623 (2012), *rev den*, 353 Or 788 (2013).

In the second trial, as in the first, defendant admitted that he shot and killed Hartman. He maintained, however, that he pulled the trigger by accident and that he did not have the necessary mental state of intentionally causing the death of another to be convicted of aggravated murder. The jury rejected defendant's mental-state defense and found him guilty of two counts of aggravated murder with a

firearm. The trial court entered a judgment of conviction for one count, merging the two guilty verdicts.

On appeal, in four assignments of error, defendant challenges evidentiary rulings of the trial court that excluded three pieces of evidence: Evidence of Hartman's racial bias as tending to show that Beachell held the same racially biased views; two demonstrative videos showing police officers accidentally discharging their handguns; and evidence that Hartman had methamphetamine in his system at the time of his death. The trial court excluded all of that evidence on the grounds that it was irrelevant under OEC 401[1], and that the probative value of the evidence, if any, was outweighed by the danger of unfair prejudice, under OEC 403.[2]

We review the trial court's relevancy determination under OEC 401 for legal error, *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999), and we review the trial court's determination under OEC 403 for an abuse of discretion, *State v. Minchue*, 173 Or App 520, 523, 24 P3d 386 (2001). As explained below, we conclude that the trial court erred in excluding the evidence of racial bias and the demonstrative videos but did not err in excluding the evidence that Hartman had methamphetamine in his system.

## EVIDENCE OF RACIAL BIAS

In two assignments of error, defendant challenges the trial court's exclusion of cross-examination of Beachell regarding her awareness of Hartman's racial bias and whether she shared that bias. Specifically, defendant sought to cross-examine Beachell about her statements to police that Hartman had a rule about not allowing African-Americans into their house and that he did not like African-Americans, and about whether Beachell shared those views.

---

[1] OEC 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."

[2] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

The two were engaged to be married and defendant argued that the evidence was relevant to show Beachell's racial bias because "you don't agree to marry someone who has those strong of views about another race unless in some way you're at least tolerant of those views or okay with them." In addition, defendant argued that Beachell's racial bias was relevant for impeachment purposes because it reasonably could have affected her memory of the events in that she consistently described defendant as aggressive and threatening and the one who punched Hartman, and Jump, who is white, as fearful and not wanting anyone to get hurt. Those recollections were contrary to defendant's testimony.

The state argued that there was no logical connection between Hartman's racial bias and Beachell sharing that bias and, thus, no relevance. The state argued that defendant could ask Beachell if she held biased views, but that he could not bring up Hartman's views because "what they're doing is tarnishing the *** reputation of a witness who isn't here anymore, that has no relevance to the case, whether or not he was the most—racist person—in the world." In addition, the state argued that the evidence was inadmissible under OEC 403 because "[t]he probative value, given what the issues are in this case, is so infinitesimally small compared to the prejudicial effect that any allegation of racism has as to any witness. I mean, even the question itself is inflammatory from the State's position."

The court ruled:

"I find that the proposed line of questioning is not relevant. It doesn't have any tendency to prove or disprove [a fact] that is of consequence to the determination of this case. It's not 609[3] material. If it had any probative value, and I don't think it does, I believe that probative value is substantially outweighed by its prejudicial impact. And I don't believe it's constitutionally required. So therefore, it will be excluded."

---

[3] OEC 609-1(1) provides:

"The credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the statement shall be shown or disclosed to the opposing party."

After that ruling, defendant did not attempt to question Beachell about her potential racial bias. Defendant in closing argued about how her statements had changed over time to attribute actions Jump had taken to defendant, after defendant was arrested. The state then argued on rebuttal with respect to Beachell's testimony:

> "I'm not going to go through it again—but she has consistently said from the beginning what happened, the sequences of events, how she was on the other side of the bed, how *** Jump was close to her, how the Black man—and apparently now she's a racist—punched *** Hartman. There's no motivation for her. She doesn't know these people. Why would she assign some different amount of responsibility to one versus the other?"

On appeal, defendant reprises his arguments that the evidence was relevant because it is a reasonable inference that Beachell shared, or at least acquiesced, to her fiancé's views about African-Americans and that those views affected her memory and description of defendant's demeanor. Defendant also argues that the trial court erred in excluding the evidence under OEC 403 because the fact that Beachell may have held racially biased views *is* the probative value of that evidence and not an unfairly prejudicial effect, as asserted by the state. Further, defendant asserts that even if the evidence did harm Hartman's reputation, such an effect is immaterial because it does not constitute *unfair* prejudice to the state's case. Finally, defendant argues that the trial court's error was not harmless, because it denied the jury a fair opportunity to assess Beachell's credibility about a key issue—whether defendant intentionally shot Hartman—and why Beachell may have assigned the actions of defendant's white accomplice—Jump—to the African-American in the room—defendant.[4]

The state responds that the trial court did not err in preventing defendant from questioning Beachell about Hartman's bias, because OEC 609-1 permits evidence only

---

[4] Defendant also argues that the trial court's exclusion of the line of questioning violated defendant's right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution. Because we conclude that the trial court erred in prohibiting the cross-examination under Oregon law, we do not reach the constitutional issue.

of *the witness's* bias and the trial court's ruling did not prohibit defendant from asking Beachell about her own bias. The state also responds that the trial court did not err in concluding that the evidence was more prejudicial than probative because it was prejudicial to Hartman's character— that is, the evidence "smeared" him.

"Evidence that supports an inference that a witness has a motive to make certain statements is relevant to show the witness's bias or self-interest." *State v. Crum*, 287 Or App 541, 551, 403 P3d 405 (2017). As the Supreme Court has stated, "[i]t is always permissible to show the interest or bias of an adverse witness." *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984) (internal quotation marks omitted). Evidence "which would otherwise be irrelevant may be offered to show the bias or interest of a witness." *Id.* (internal quotation marks omitted). All that is required to clear the bar of relevance of such evidence is that the evidence "have a mere tendency to show the bias or interest of the witness." *Id.* In addition, "[a] party may impeach a witness for bias through evidence of the witness's relationship with another where the bias resulting from the relationship is a matter of reasonable inference rather than mere speculation." *State v. Prange*, 247 Or App 254, 261, 268 P3d 749 (2011).

As noted, the state argued that the evidence defendant sought to introduce was not relevant because it did not tend to show that *Beachell* held a racial bias. We conclude otherwise. Bias or interest can be shown through the witness's relationship to another person when the bias is a matter of reasonable inference. In *State v. Knobel*, 97 Or App 559, 566, 777 P2d 985 (1989), *rev den*, 309 Or 522 (1990), the defendant sought to cross-examine a state witness, a deputy sheriff, about his awareness of derogatory articles that the defendant had written about the sheriff and the sheriff's dislike of the defendant and support of pressing charges against the defendant. The defendant sought to ask the questions in an attempt to show the bias of the deputy sheriff, but the trial court excluded the line of questioning as not relevant. *Id.* On appeal, we reversed because, "[i]n view of [the deputy sheriff's] employe-employer relationship with [the sheriff]," the inquiries were relevant to the deputy sheriff's credibility as a witness. *Id.*

In *Prange*, the defendant "sought to challenge the victim's credibility by offering evidence of hostilities between the victim and victim's wife and the defendant's stepdaughter, which, [the] defendant contended, motivated the victim to make false accusations against him." 247 Or App at 256. The trial court excluded the evidence, and we reversed. We concluded,

> "Although some inferences are required to connect that previous dispute to the victim's attitude toward defendant, the inferences are permissible. A jury could reasonably infer that, in light of the familial relationships among the persons involved * * * the victim had reason to be biased against defendant. From that, a jury could infer that the victim's account was less credible than it would have been in the absence of evidence of the earlier dispute. Defendant's proffered evidence had at least a 'tendency to show the bias or interest of the witness,' *Hubbard*, 297 Or at 796, and thus was relevant."

*Id.* at 262; *see also State v. Del Real-Galvez*, 270 Or App 224, 231, 346 P3d 1289 (2015) (evidence that the victim's mother had applied for a "U" visa to remain in the United States based on the victim's allegations of sexual abuse against the defendant, who was the victim's uncle, was relevant and admissible to show that the victim had a personal interest in testifying against the defendant).

In contrast, we have affirmed the trial court's exclusion of bias or interest evidence based on a relationship between the witness and another person when the purported bias resulting from such a relationship requires the stacking of too many inferences to the point of speculation. In *State v. Phillips*, 245 Or App 38, 261 P3d 55 (2011), *rev den*, 351 Or 545 (2012), the defendant sought to introduce evidence of an altercation between the defendant and another police officer, Kaufman, to impeach the testimony of the arresting officer, Cook, who was not involved in the altercation. We noted that the "defendant offered no evidence to establish any motive on the part of Cook to lie to protect Kaufman beyond the mere fact that both were police officers," and, thus, we concluded that the string of inferences was too long. *Id.* at 46.

Here, we conclude that the evidence defendant sought to introduce was relevant to show Beachell's potential bias against defendant. Defendant sought to introduce evidence that Beachell knew that Hartman did not like African-Americans and that he did not allow them in the house that Beachell and Hartman shared with their infant son. Also, Beachell and Hartman were engaged to be married. Although it requires some inferences to connect the evidence to Beachell's credibility, those inferences are permissible. It is a reasonable inference that, given their relationship and shared household, at a minimum, Beachell tolerated Hartman's very negative racist views and agreed to abide by his rule about not allowing African-Americans in the house. From that, a jury could infer that Beachell's account of the events was less credible than it would have been in the absence of that evidence because those views could have biased her perceptions of the actions of defendant, an African-American. We thus conclude that the evidence which defendant sought to explore through cross-examination of Beachell had at least a "tendency to show the bias or interest of the witness," *Hubbard*, 297 Or at 796, and thus was relevant.

We also conclude that the trial court erred in excluding the evidence under OEC 403. We review that determination for an abuse of discretion. However, if the evidence has no unfairly prejudicial effect, then the trial court has erred as a matter of law if it excluded the evidence based on unfair prejudice. *See State v. Wilhelm*, 168 Or App 489, 496, 3 P3d 715 (2000) ("When *** no unfair prejudice results from the evidence's admission, the trial court ha[s] no discretion to exclude it.").

With respect to bias evidence, "[t]he trial judge, in his or her discretion, may limit the extent of evidence pursuant to OEC 403. However, the cross-examiner must be given the opportunity to establish sufficient facts from which the bias or interest may be inferred, because it is always permissible to show bias or interest." *Hubbard*, 297 Or at 800. Based on *Hubbard*, we have held that, if the trial court's exclusion of bias evidence would prevent a party from making an initial showing of that witness's bias, the court

cannot exclude that evidence under OEC 403. *See Prange*, 247 Or App at 264-65 ("When the trial court excluded the stepdaughter's proffered evidence at the beginning of defendant's case-in-chief, there had been no other showing of the victim's bias. Under *Hubbard,* 297 Or at 798, the trial court could not have excluded the evidence of the victim's bias on the basis of OEC 403."). However, where the witness's bias is evident from other evidence at trial, the trial court may exclude it under OEC 403. *See State v. Fish*, 239 Or App 1, 7-8, 243 P3d 873 (2010) (disputed evidence did not constitute an "initial showing" because the witness's interest in the litigation was apparent from the respective roles of the defendant and the witness, who was the victim, and the underlying facts of the case; thus, the trial court had discretion to weigh the evidence under OEC 403).

Here, it is unclear that defendant was prevented from making an "initial showing" of Beachell's potential racial bias. But, assuming without deciding, that the trial court did have discretion to weigh the evidence under OEC 403, we conclude that, because the relevant evidence of bias which defendant sought to introduce had no unfairly prejudicial effect, the trial court erred as a matter of law in excluding it.

Under OEC 403, a trial court may exclude relevant evidence if the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." Evidence is unfairly prejudicial when it has "an undue tendency to suggest a decision on an improper basis, commonly, although not always, an emotional one," and "describes a situation in which the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish a fact of consequence." *State v. Lyons*, 324 Or 256, 280, 924 P2d 802 (1996). Admissibility of evidence is favored under OEC 403 and "places the burden on the party seeking exclusion of the evidence, but it also allows a means of excluding distracting evidence from a trial." *State v. Sewell*, 257 Or App 462, 469, 307 P3d 464, *rev den*, 354 Or 389 (2013). In exercising its discretion under OEC 403, the

trial court is to be guided by the four steps set out in *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987).

We first address the blanket unfair prejudice argument that the state has raised both below and on appeal. Essentially, the state argues that asking if someone holds racist views will always raise a large specter of unfair prejudice because it is simply *too inflammatory* to even *ask* the question. We reject that premise. Whether particular bias evidence is permissibly subject to exclusion under OEC 403 must be based on the precise evidence at issue and the context of the trial. It is not appropriate to reject wholesale such evidence based on the ill-conceived notion that, as the state put it below, "even the question itself is inflammatory." Whether a witness holds certain racially based biases is potentially relevant to that witness's credibility; there is nothing specific to evidence of racism that automatically makes it unduly prejudicial. Moreover, where it is the thing itself—the witness's potential racial bias—that makes the evidence relevant, the thing itself—the witness's potential racial bias—cannot also be the source of any *unfair* prejudice. *See, e.g.*, *Wilhelm*, 168 Or App at 495 ("In this case, the jury could infer from defendant's letters that he had a romantic relationship with the victim. But that inference is precisely why the letters are probative. Any prejudice that may result from the letters is not 'unfair prejudice,' as the court has explained the concept."). To take a position that even asking the question that seeks to uncover relevant biases is too inflammatory to risk is contrary to Oregon law governing the admission of bias evidence.

More specifically to this case, the state also argues that the tenuous relevance of showing Beachell's potential bias through questions about Hartman's bias is substantially outweighed by the risk that the evidence would "smear" Hartman, the victim, who cannot rehabilitate himself. We also reject that argument because a "smear" against Hartman that he held racially biased views does not result in unfair prejudice to the state. Defendant admitted to killing Hartman, he has not asserted self-defense, and he did not seek to justify the killing in any manner; the sole question at trial was whether defendant killed Hartman with the

necessary mental state. Whether *Hartman* held racist views could not have damaged the state's case, either unfairly or fairly. In sum, the evidence did not have the unfairly prejudicial effect advanced by the state. Thus, the court erred in precluding defendant from cross-examining Beachell about her knowledge of Hartman's racial bias and his rule against allowing African-Americans into their shared house and whether she shared those views.

Having concluded that the trial court erred, we turn to whether that error was harmless. "Erroneous exclusion of evidence of a witness's bias or personal interest is not harmless if, as a result of the exclusion, the jury is 'not fully informed of matters relevant to an assessment of [the witness's] credibility.'" *Crum*, 287 Or App at 554 (quoting *State v. Valle*, 255 Or App 805, 815, 298 P3d 1237 (2013) (alteration in *Crum*)).

The state does not advance an argument on appeal that any trial court error was harmless, and we conclude that it was not. Given the discrepancies in Beachell's and defendant's testimony about defendant's aggressiveness and being "in charge," which related directly to inferences about defendant's mental state when he killed Hartman, Beachell's credibility about her memory of the events was important to the outcome at trial. And, the jury did not otherwise have an adequate opportunity to assess her credibility in light of her potential racial bias. Thus, particularly in view of the state's closing argument that appeared to mock the idea that Beachell's memory could be affected by racial bias, the trial court's error in excluding the evidence was not harmless.

Accordingly, we reverse and remand to the trial court. However, because the issues are likely to arise again on remand, we address defendant's remaining assignments of error. *See Dept. of Transportation v. Stallcup*, 195 Or App 239, 254-55, 97 P3d 1229 (2004), *rev'd on other grounds*, 341 Or 93, 138 P3d 9 (2006) ("In general, we consider issues to be likely to arise on remand when the trial court or agency has determined a question of law that will still be at issue after the case is remanded.").

VIDEOS OF ACCIDENTAL FIREARM DISCHARGES

We next address defendant's assignment of error that challenges the trial court's exclusion of two videos showing police officers accidentally discharging their handguns. At trial, both the state and defendant presented expert testimony related to the ease with which the type of gun defendant had used could be accidentally discharged. The state firearms examiner, Leland Samuelson, testified that, to fire the type of gun defendant used, the hammer had to be pulled back and two safeties had to be off—a thumb safety with an up/down switch and a grip safety, which requires the user to squeeze the handle to pull the trigger. In addition, Samuelson testified that the gun had a "trigger pull weight" of about five pounds, which he equated to lifting a half gallon of milk with your finger, which "is a significant amount of force to move that." He also testified that accidental discharges generally occur because a person has failed to appropriately unload ammunition from the firearm.

Defendant presented expert testimony from James Smith. He testified that the causes of accidental discharges usually include not keeping your finger off the trigger coupled with a startle response, a sympathetic muscle response, or a stumble response. Smith discussed two examples of accidental discharges, including one by a police officer. He further testified that pulling a trigger involves more muscles than your finger and that a trigger finger can pull 56 pounds coupled with the grip, so a five-pound trigger pull is not equivalent to lifting a five-pound object with your finger. He also testified that the external safety in the grip would be engaged anytime the weapon was in your hand, so the gun would be ready to fire, as long as the other safety was off.

In addition to Smith's testimony, defendant sought to introduce, as demonstrative aids, two videos of police officers accidentally discharging their handguns. The videos together are no more than a couple minutes long. One is from an evening news report and shows an officer accidently shooting his handgun into the side of a car while holstering, and the other shows an officer in a classroom talk about gun safety accidentally shooting his gun.

Defendant argued that the videos were relevant as an aid in discussing the startle response and accidental discharge of a handgun. Defendant agreed that the videos were not similar to the facts in this case but argued that "they are relevant in that it shows that—the type of circumstances in which an accidental discharge could happen." The state sought to exclude those videos as "more prejudicial than probative" because neither video shows an accidental shooting that is similar to the facts in this case. The state further argued that the videos would not assist the jury for the same reason.

The trial court excluded the videos, stating, "They're not admissible. They're not—they're not relevant. And to the extent that they had any relevancy, their prejudicial impact would substantially outweigh the probative value."

On appeal, defendant first argues that the videos were relevant because they demonstrate that it can be easy to accidentally discharge a handgun and that it can happen without making the mistake of assuming that the weapon was unloaded. Defendant argues that the demonstrative evidence was plainly relevant to his defense to show the general plausibility of his defense that he accidentally pulled the trigger on his gun. Defendant also argues that the trial court erred in ruling that the probative value of that evidence was substantially outweighed by unfair prejudice because neither the state nor the trial court identified what was "unfair" about that evidence. Moreover, defendant argues, the videos do not contain anything that would "inflame the emotions of a jury," or invite the jury to decide the case on reasons unrelated to the evidence.

The state responds that "defendant's proffered evidence demonstration was irrelevant and inadmissible because he failed to establish that the conditions surrounding either of the videos were substantially similar to the conditions surrounding defendant's discharge of his handgun in the underlying offenses."[5] The state also argues that

---

[5] The state argues, for the first time on appeal, that "the conditions" include specifics about the firearms that were used in the videos, including the type of firearms, their safety features, and their trigger pull weights. The state, however, did not raise that argument below, and the trial court did not exclude the evidence on that basis. Thus, we do not address it.

the trial court did not abuse its discretion in excluding the videos under OEC 403, because the videos would have created "confusion of the issues" and "undue delay."

Turning first to relevance, the threshold is low. "[E]vidence is relevant so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Barone*, 329 Or 210, 238, 986 P2d 5 (1999). "[T]o 'have probative value, evidence does not need to be persuasive on the issue, but merely be worthy of the jury's consideration because it calls to their attention a fact that raises a possibility that is not completely unreasonable.'" *State v. Hudson*, 279 Or App 543, 554, 380 P3d 1025 (2016) (quoting *Fugate v. Safeway Stores, Inc.*, 135 Or App 168, 173, 897 P2d 328 (1995)). We review the trial court's relevance determination for legal error.

We conclude that the two videos were relevant. Contrary to the state's assertion, the videos did not need to depict circumstances similar to the facts in this case to have relevance. Rather, we must measure the relevance of the proffered demonstrative evidence in the context of the material issue in the case and the parties' arguments with respect to that issue. *See Hudson*, 279 Or App at 554 (evaluating relevance of proffered evidence in relation to the defendant's theory of the case and the parties' arguments). Here, defendant's theory of the case was that he accidentally discharged his gun, likely due to a startle response, after Jump hit Hartman. The state argued, through expert testimony, that that was unlikely because it would be difficult to accidentally pull the trigger on the gun, because of the grip safety and the trigger pull weight. Defendant offered his own expert testimony that an accidental discharge from a startle response was plausible. The video evidence was further probative evidence that defendant's version of events was plausible, because it depicted trained police officers accidentally discharging their handguns and tended to bolster defendant's expert's testimony about the ease with which an accidental discharge could occur. As stated in *Hudson*, "[t]hat probative value of the evidence is not undermined by the fact that the images depict an act different than the act of which defendant was accused." *Id.*

We thus to turn to the trial court's ruling to also exclude the evidence under OEC 403. As discussed above, we review that determination for an abuse of discretion, but if the evidence has no unfairly prejudicial effect, then the trial court has erred as a matter of law. *Wilhelm*, 168 Or App at 496.

As explained above, evidence is unfairly prejudicial when it has "an undue tendency to suggest a decision on an improper basis, commonly, although not always, an emotional one," and "describes a situation in which the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish a fact of consequence." *Lyons*, 324 Or at 280. In addition, confusion of the issues can occur when the presentation of the evidence would confuse or distract the jury from the central issue in the case by, for example, creating "mini-trials" about whether a collateral act did or did not happen. *See State v. Cox*, 337 Or 477, 487, 98 P3d 1103 (2004), *cert den*, 546 US 830 (2005) (affirming exclusion of evidence under OEC 403 where the trial court explained, among other things, that evidence about defendant's acts towards persons who were not the victim created potential for mini-trials about those acts); *see also Lyons*, 324 Or at 279 (discussing under OEC 702 that presentation of PCR-based DNA evidence did not risk confusion of the issues where it was not overly complex to explain, only two competing experts testified, and the testimony comprised less than 200 pages of transcript).

Here, we conclude that the trial court abused its discretion in excluding the videos under OEC 403. First, the trial court did not properly weigh that evidence because it did so while attributing little to no probative value to the video evidence. As explained above, those videos did have probative value that pertained to the key issue in the case. Moreover, as videos, they would have provided a qualitatively different explanation for the jury as to how an accidental discharge could occur than the competing expert testimony about trigger pull weights. Second, neither the trial court nor the state ever identified what the *unfair* prejudicial effect of those videos would be, nor can we perceive on this record what that effect could be. Although a trial court is not required to exhaustively articulate on

the record its thought process in weighing evidence under OEC 403, the record must nonetheless be sufficient to allow us to identify the purported unfair prejudice. *See State v. Anderson*, 363 Or 392, 406, 423 P3d 43 (2018) ("[A] court will make a sufficient record under *Mayfield* if the trial court's ruling, considered in light of the parties' arguments, demonstrates that the court balanced the appropriate considerations.").

The lack of identifiable unfair prejudice in the record is highlighted by the state's failure to explain on appeal what that prejudicial effect was. Rather than defending the trial court's ruling, the state argues on appeal that the trial court did not err under OEC 403 because the evidence would have confused the issues or caused unnecessary delay. The trial court, however, did not rely on those grounds for its discretionary OEC 403 ruling. Even assuming that this is an appropriate case in which to address those arguments under the "right for the wrong reason" principle, when such arguments are generally limited to matters of law and not ones of discretion, we reject them. *See State v. Rogers*, 330 Or 282, 295, 4 P3d 1261 (2000) ("The 'right for the wrong reason' principle establishes that appellate courts may examine legal arguments not relied on by a trial court to determine if those arguments provide a basis for affirmance.").

We are not persuaded that two videos, which total a few minutes, would have caused such unnecessary delay that exclusion under OEC 403 was warranted. Nor do we understand how the videos would have been so confusing as to warrant such exclusion. The videos clearly depict circumstances that are not similar to the undisputed facts in this case, and, thus, would not have confused the jury to think that they did depict similar circumstances. The fact that the circumstances in the videos were different from the facts in this case—differences the state was free to explore at trial—goes to the weight the jury might give that evidence, not to its admissibility. The jury would have been capable of weighing the probative value of the videos without confusing what issues it was being called on to decide.

Because we already must reverse and remand based on the other error committed by the trial court, as addressed

above, we do not determine whether the trial court's error in excluding the videos was harmless.

## EVIDENCE THAT HARTMAN HAD METHAMPHETAMINE IN HIS SYSTEM

Finally, defendant also sought to introduce evidence that Hartman had methamphetamine in his system at the time of his death. Defendant argued that the evidence was relevant because it tended to show that Hartman would have been resistant to defendant and Jump accessing the safe because "[m]eth makes you amped up." Defendant also argued that, more specifically, it was relevant because Beachell testified that Hartman took a Valium that night and was asleep when defendant and the other men arrived, which left the jurors with the impression that Hartman was on Valium and mellow, when the true state of affairs was that "he was actually high on methamphetamine that night."

The state responded that the evidence was not relevant because the testimony was not that Hartman was sleepy or mellow and, because it was a low level of methamphetamine, Hartman would not have been under the influence at the time. The state also argued that the evidence was highly prejudicial because it showed Hartman was a drug user.

The court ruled, "Considering the evidence in the record, I find that it's not relevant and I won't allow that cross-examination. If it was relevant, its relevance would be substantially outweighed by its prejudicial impact."

On appeal, defendant argues that the fact that Hartman had methamphetamine is his bloodstream was relevant because it had a tendency to make defendant's version of events more plausible. Defendant also argues that the jury was left with an incomplete picture, given that Beachell testified that Hartman had taken Valium before going to bed. Finally, defendant argues that the evidence was relevant because it cast doubt on Beachell's credibility because she had testified in a manner that minimized drug use in the house.

We reject each of defendant's relevancy arguments. First, defendant failed to preserve his arguments that the evidence was being offered to rebut Beachell's credibility, or that it tended to corroborate defendant's version of events. With respect to defendant's preserved arguments, we disagree that the evidence was relevant. As stated above, "evidence is relevant so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *Barone*, 329 Or at 238. Here, the sole issue at trial was whether defendant possessed the necessary mental state to be convicted of aggravated murder or whether, as defendant maintained, he accidentally discharged the gun. Whether Hartman had methamphetamine in his system and was "amped up" is not relevant to that inquiry. Nor did the fact that Beachell testified that Hartman had taken a Valium require that that testimony be admitted. Hartman's demeanor or level of resistance to the home-invasion robbery was not a fact of consequence in the trial. Accordingly, the trial court did not err in excluding that evidence.

In sum, the trial court erred in excluding the evidence of racial bias and that error was not harmless. In addition, the trial court erred in excluding the two videos showing police officers accidentally discharging handguns. However, the trial court did not err in excluding the evidence that Hartman had methamphetamine in his system at the time of his death because that evidence was not relevant.

Reversed and remanded.