Argued and submitted October 19, 2018, reversed and remanded July 8, 2020

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JOHN IVAN SHEPHERD,
aka John Shephard,
*Defendant-Appellant.*

### Union County Circuit Court
F21667; A163736

468 P3d 487

Defendant appeals from a judgment convicting him of delivery of meth-amphetamine, ORS 475.890. That charge arose after defendant allegedly sold methamphetamine to the state's key witness, Lewis, during a controlled buy. On appeal, defendant argues that the trial court committed reversable error when it refused to allow him to cross-examine Lewis about the sexual interest that Lewis had in defendant's wife, and the bias that defendant believed Lewis held against him as a result. The state concedes that the trial court erred but contends that the error was harmless. *Held*: The Court of Appeals accepted the state's concession that the trial court erred. However, that error was not harmless because the trial court precluded defendant from presenting qualitatively different evidence from that presented at trial and the state capitalized on the lack of such evidence to discredit defendant's theory of the case.

Reversed and remanded.

Brian Dretke, Judge.

Matthew Blythe, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

E. Nani Apo, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.*

_____

* DeVore, J., *vice* Hadlock, J. pro tempore.

DeHOOG, P. J.

Reversed and remanded.

**DeHOOG, P. J.**

Defendant appeals from a judgment convicting him of delivery of methamphetamine for consideration, ORS 475.890. Defendant raises two assignments of error, each related to the same issue. First, defendant argues that the trial court erred when it refused to admit impeachment evidence that would have demonstrated that the state's key witness, Lewis, was biased against him due to Lewis's sexual interest in defendant's wife, R. Second, defendant argues that the court erred in prohibiting him from cross-examining Lewis regarding that potential source of bias. In a combined argument, defendant contends that the court should have allowed him to cross-examine Lewis under OEC 609-1(1) regarding the facts that purportedly showed his bias against defendant and, if Lewis had denied those facts, admitted evidence of them under OEC 609-1(2). Defendant further asserts that the error was harmful. The state concedes that the trial court erred by prohibiting defendant from inquiring about Lewis's sexual interest in R during cross-examination. However, contending that the excluded evidence was of minimal relevance and emphasizing the strength of the prosecution's case, the state argues that the error was harmless. We accept the state's concession that the trial court erred, but we conclude that the error was not harmless. Accordingly, we reverse and remand.

"We review for legal error a trial court's decision to preclude a party from attempting to establish facts showing a witness's bias under OEC 609-1." *State v. Nacoste*, 272 Or App 460, 466, 356 P3d 135 (2015). In assessing whether the erroneous exclusion of defendant's impeachment evidence was harmless, "we describe and review all pertinent portions of the record, not just those portions most favorable to the state." *State v. Cook*, 264 Or App 453, 454, 332 P3d 365 (2014) (applying that standard to an appeal of a ruling admitting disputed evidence) (internal quotation marks omitted).

The charges against defendant arose from an undercover drug investigation. At the time, Lewis was acting as an informant for the Union County Drug Task Force to "work off" a drug possession charge of his own. In an

effort to direct the task force to illegal drug activity, Lewis identified defendant as an individual from whom he could purchase methamphetamine, and, at the direction of the task force, he arranged by text message to purchase methamphetamine from defendant.

On the day of the planned controlled buy, Lewis met with two members of the task force, Harris and Gridley. To prepare for the buy, they searched Lewis and his car to ensure that he was not in possession of any money or methamphetamine. They also fitted Lewis with a body wire and gave him $50 to facilitate his anticipated purchase of methamphetamine from defendant. Lewis then drove to defendant's house, while Harris and Gridley kept his vehicle in constant sight. They watched Lewis as he entered defendant's home and listened to the interactions inside through the body wire. Much of the recorded conversation appears to have been unrelated to the investigation or is indiscernible. Nonetheless, the state both argued at trial and maintains on appeal that the following portion of the recorded encounter reflects an unlawful exchange of methamphetamine.

> "[Defendant]: (Indiscernible) give you five bucks back (indiscernible) for the little bowl (indiscernible).
>
> "[Lewis]: I can't do any right now, I've gotta take a UA before 5:30.
>
> "[Defendant]: *** All right, then don't do that. (Indiscernible) give me my pipe back."

After hearing further unrelated conversation, Harris and Gridley watched Lewis leave defendant's home and drive to a predetermined location, where the three reconvened. Harris testified at trial that Lewis had then "turned the meth he'd bought from [defendant] over to Detective Gridley." There the detectives again searched Lewis's car and person to ensure that he had not kept any methamphetamine. Harris also testified that Lewis no longer had any of the $50 that he had been given before the controlled buy. Defendant was subsequently arrested and charged with possession and delivery of methamphetamine. Other than testifying that he still had the $5 that defendant had returned to him at the conclusion of the alleged drug

transaction, Lewis testified in a manner generally consistent with the detectives' accounts and the prosecution's theory of the case.

Defendant, however, gave a different account of those events at trial. According to defendant, Lewis had come to his house with methamphetamine, and he had unsuccessfully attempted to buy some of Lewis's methamphetamine from him after he removed it from a cigarette pack. R testified to the same facts at trial. Defendant's position at trial was that the audio recording was too unclear to definitively refute his account and that the state, therefore, could not establish beyond a reasonable doubt that he was guilty of the charged offenses. Although defendant conceded that, under his own account of events, he was guilty of attempted possession of methamphetamine, he maintained that he was not guilty of actual possession or of delivery.

To support that defense, defendant attempted to prove that, at both the time of the controlled buy and at trial, Lewis had a motive to lie about defendant's role in the alleged drug transaction. Through a motion *in limine*, defendant sought a ruling that he could present evidence of Lewis's purported bias against him. Defendant specifically offered evidence of messages exchanged between Lewis's and R's Facebook accounts approximately seven months after the controlled buy. In those messages, Lewis expressed a sexual interest in R and professed to have had such an interest in her "'for years.'" The messages referenced a planned affair and the exchange of explicit photographs. What Lewis did not initially know, however, was that defendant had been impersonating R the entire time; after defendant disclosed that fact to Lewis, the exchange of Facebook messages stopped.

Although the exchange of Facebook messages took place well after the controlled buy, defendant contended that the messages showed that Lewis was biased against him and had a motive to lie at the time of the alleged drug transaction, which, he argued, was evidenced by Lewis's professed interest in R "for years." Defendant argued that the evidence showed "Lewis's motive for going to the police in the first place *** and suggesting the buy."

The trial court rejected defendant's argument and denied the admission of the messages into evidence, ruling that they were not relevant and that defendant was improperly seeking to impeach a witness on a collateral matter. The court also rejected defendant's argument that the content of the messages was an appropriate subject for cross-examination because "cross-examination allows broad questioning regarding motive, intent, [and] bias." In rejecting that argument, the court simply explained that the messages did not have "any place in this case."

In light of the court's pretrial ruling, neither the Facebook messages nor Lewis's professed interest in R came up at trial. The question of motive, however, did arise. Specifically, during the state's closing argument, the prosecution asserted that only its version of events was credible and that, in order to acquit defendant, the jury would have to believe that Lewis set out to frame defendant despite having had no motive to do so. The state argued:

"Now, the defendant has been trying to insinuate and say, in their opening statement and through their testimony, that he never sold methamphetamine to *** Lewis. That *** Lewis brought the methamphetamine there himself[;] he had it and attempted to sell it to him.

"In order for you guys to believe that[,] two things *** are necessary. One, that Mr. *Lewis is just a bad guy out there trying to frame people for things that they did not do, that's a necessary conclusion to reach.*

"Two, that two officers, not just one, are so incompetent at their job that they did not thoroughly search [Lewis and his vehicle], allowing [a] bad person to be able to frame someone for something they didn't do.

"That is lightning striking twice in the same location on the same day, right. That is not a reasonable explanation of what occurred. These officers are experienced officers. They know what they're doing and they know how to conduct a search. This ain't their first rodeo. Okay?

"*The story put out by the defendant and his wife also makes no sense.* Mr. *** Lewis just drove to this residence to sell methamphetamine, pull it out and try to sell them. Hey, I heard you guys party or whatever. So trying

to—attempting to sell them methamphetamine. And then when they get a yes, not. Just leaving. That makes no sense. It's not consistent with what you hear in \*\*\* the audio recording at all."

(Emphases added.)

In his closing, defendant summarized the version of events to which he had testified, and he argued that the jury's decision "boil[ed] down to a case of credibility" between Lewis's testimony and his own. And, defendant contended, Lewis's testimony was "suspect" because he was seeking to have his own possession charge dropped in exchange for his involvement in the controlled buy and his testimony against defendant. In rebuttal, the prosecution once again emphasized that defendant's account of events was not reasonable, explaining to the jury that, to find defendant not guilty, they would "have to find that Mr. Lewis exploited [the mistakes of Harris and Gridley] and benefitted from that because he's a bad guy that just wants to go out there and frame people."

Ultimately, the jury found defendant guilty of both possession of methamphetamine and delivery of methamphetamine for consideration. At sentencing, the court merged the jury's guilty verdicts into a single conviction of delivery of methamphetamine for consideration. Defendant now appeals the resulting judgment.

On appeal, defendant argues that the trial court erred in declining to admit the Facebook messages or, at a minimum, to allow him to cross-examine Lewis about the messages. Citing Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution, defendant argues that his "right to present impeachment evidence implicates his state and federal constitutional rights to confront witnesses." *See State v. Crum*, 287 Or App 541, 552, 403 P3d 405 (2017) (explaining that the right to confront witnesses under the state and federal constitutions "includes the right to question a witness about circumstances from which a jury could reasonably infer that the witness has a motive to testify in a certain manner" (internal quotation marks omitted)). As a statutory matter, defendant argues that the trial court's rulings violated OEC 609-1, and, as noted, the state concedes that issue.

The state's concession regarding defendant's statutory argument is well taken. The relevant portion of OEC 609-1 provides:

"(1)  The credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the statement shall be shown or disclosed to the opposing party.

"(2)  If a witness fully admits the facts claimed to show the bias or interest of the witness, additional evidence of that bias or interest shall not be admitted. If the witness denies or does not fully admit the facts claimed to show bias or interest, the party attacking the credibility of the witness may then offer evidence to prove those facts."

Defendant asserts that, under OEC 609-1(1), he was entitled to cross-examine Lewis regarding his professed sexual interest in R. Had Lewis denied the facts showing that potential source of bias, defendant contends, he would then have been entitled, under OEC 609-1(2), to offer at least those Facebook messages suggesting that Lewis's interest in R had predated the controlled buy. The state specifically concedes "that there was no basis for preventing defendant from asking Lewis about his sexual interest in [defendant's wife] during cross-examination" and that the messages would have been admissible if Lewis had denied or not fully admitted the interest that the messages described.[1]

We agree that, on this record, there was no apparent basis for the trial court to prevent defendant from asking about Lewis's potential bias against defendant; accordingly,

---

[1] At oral argument, the state clarified that it concedes "that the evidence at issue was relevant to show that [Lewis] had a personal interest in the outcome of the case but not for bias purposes, which would be * * * [that] he had some kind of animosity towards the defendant." While we agree that, in some instances, one's bias against a party may be distinct from an interest in an outcome adverse to that party, we do not understand the state's clarification to suggest that any such distinction is material here, nor do we see any reason that it would be. More significantly, we do not view that clarification as withdrawing the state's concession that defendant was entitled under OEC 609-1 to put the underlying issue before the jury.

we accept the state's concession that the trial court erred in foreclosing that inquiry. As Oregon courts have recognized, an established principle of Oregon evidence law is that "[i]t is always permissible to show the interest or bias of an adverse witness." *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984) (internal quotation marks omitted); *see State v. Lulay*, 290 Or App 282, 292, 414 P3d 903, *rev den*, 363 Or 283 (2018) (same). Furthermore, "[u]nder OEC 609-1(1), the credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest." *State v. Andrew*, 297 Or App 299, 300, 441 P3d 247 (2019) (internal quotation marks and brackets omitted). "All that is required to clear the bar of relevance of such evidence is that the evidence 'have a mere tendency to show the bias or interest of the witness.'" *State v. Naudain*, 300 Or App 222, 230, 452 P3d 970 (2019), *rev allowed*, 366 Or 257 (2020) (quoting *Hubbard*, 297 Or at 796).

In operation, OEC 609-1(1) permits a party to first "cross-examine a witness about acts from which it could be inferred that the witness is biased against the party." *State v. Miller*, 272 Or App 737, 744, 358 P3d 301 (2015). During that examination, "'[w]ide latitude must be given to the cross-examiner to ask for and receive answers to questions sufficient to demonstrate to the jury the nature of the bias or interest of the witness.'" *Nacoste*, 272 Or App at 468 (quoting *Hubbard*, 297 Or at 798) (internal brackets omitted). Then, "[i]f the witness does not admit the acts [on cross-examination], *** the party may introduce additional evidence of bias" under OEC 609-1(2). *Miller*, 272 Or App at 744.

As relevant here, we have explained that a "party may impeach a witness for bias through evidence of the witness's relationship with another where the bias resulting from the relationship is a matter of reasonable inference rather than mere speculation." *Naudain*, 300 Or App at 230 (internal quotation marks omitted). Relatedly, "it is error for a trial court to exclude evidence from which a jury could reasonably infer that a witness has a motive to testify in a certain manner." *State v. Hernandez*, 269 Or App 327, 332, 344 P3d 538 (2015) (internal quotation marks and brackets omitted). Here, the messages at issue readily supported an

inference that Lewis was sexually interested in defendant's wife and desired some form of relationship with her. From that evidence, the jury could reasonably have drawn the further inference that Lewis was motivated to implicate defendant in criminal activity and perhaps distance him from R, and that Lewis was therefore biased against defendant. As a result, the trial court erred in prohibiting that inquiry. We therefore accept the state's concession.

That does not, however, resolve the parties' dispute on appeal, because they disagree on whether the court's error was harmful. Defendant argues that the court's error was harmful because the prosecution "heavily emphasized" Lewis's lack of motive to lie about the controlled buy and "affirmatively drew attention to [his] *lack* of a motive to falsely testify against defendant," arguing, as defendant puts it, "how outlandish it would be for someone to lie to police without any motive to do so." (Emphasis in original.) Defendant concludes that, because the trial court erroneously precluded him from exploring that key aspect of the state's case, the court's error "likely affected the verdict."

In response, the state emphasizes that it is defendant's burden to establish that the court's error was not harmless and argues that he has not met that burden here. Quoting our decision in *State v. Gerard*, 188 Or App 414, 421, 72 P3d 88 (2003), the state asserts that we must "'determine the relative strength of the parties' evidence and then consider, in the totality of the evidence, how significant the erroneously excluded evidence was.'" Purporting to apply *Gerard*, the state argues that the testimony of Harris and Gridley, as well as the contents of the audio recording, uniformly contradicted defendant's version of events and that, by comparison, the excluded evidence of Lewis's potential bias against him was weak. As a result, the state concludes, "the evidence of Lewis's sexual interest in [defendant's wife] would have had little likelihood of affecting the jury's verdict."

We disagree with the state's reliance on *Gerard* and, particularly, the state's argument that the focus of our harmlessness analysis must be on the relative strength of the evidence supporting each party's position. *See Gerard*,

188 Or App at 421. We decided *Gerard* shortly before the Supreme Court decided *State v. Davis*, 336 Or 19, 77 P3d 1111 (2003), in which the court established the harmlessness analysis that we must apply here. In *Davis*, the Supreme Court explicitly cabined the harmlessness analysis:

> "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling."

*Id.* at 32. We continue to apply that standard nearly two decades later. *See, e.g.*, *State v. Black*, 364 Or 579, 595, 437 P3d 1121 (2019) (explaining that an error is only harmless if it had "little likelihood of affecting the verdict" (internal quotation marks omitted)). And, as the Supreme Court explained in *Davis*, a determination that the "particular issue to which the error pertains has no relationship to the jury's determination of its verdict" is "a legal conclusion about the likely effect of the error on the verdict"; it is not "a finding about how the court views the weight of the evidence of the defendant's guilt." 336 Or at 32; *see also Black*, 364 Or at 596 ("In making a determination of harmlessness, the court does not ask whether the evidence of guilt is substantial or compelling, but rather whether the trial court's error was likely to have influenced the verdict." (Internal quotation marks omitted.)).

"An error is less likely to be harmless where it relates to a central factual issue in the case," *Black*, 364 Or at 596, though it may nevertheless be harmless error to exclude such evidence if it "is merely cumulative of, instead of qualitatively different than, evidence presented to the factfinder," *id.* (internal quotation marks omitted). Of particular relevance here, in assessing the likely relationship between an error and the jury's ultimate determination, an error is reversible "if it denies the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial." *Andrew*, 297 Or App at 300 (internal quotation marks omitted).

Applying those principles, we conclude that the trial court's error was not harmless, because Lewis's credibility was central to the parties' arguments at trial and the jury was not given an adequate opportunity to assess his credibility. In determining that Lewis's credibility was a central factor at trial, we need look no further than the prosecution's closing arguments. There, the prosecutor repeatedly urged the jury to reject defendant's theory as unreasonable because Lewis had no motive to frame him. As the prosecutor put it, the only way for the jury to find defendant not guilty would be to conclude that Lewis was "just a bad guy out there trying to frame people." The prosecutor rhetorically asked why Lewis would have driven to defendant's house uninvited, brought out his own methamphetamine, and then left without having made a sale. In the prosecutor's view, that theory made "zero sense." In other words, the prosecution's own arguments rendered Lewis's credibility—and, specifically, any motive that he may have had to lie about defendant's involvement in drug activity—a central issue at trial and explicitly focused the jury's attention on that issue.

Notwithstanding that emphasis on Lewis's credibility at trial, the state contends that the court's erroneous exclusion of impeachment evidence was ultimately unlikely to have affected the verdict, because the prosecution also argued to the jury that the testimony of Harris and Gridley was itself sufficient to support a conviction; they did not have to believe Lewis at all. That may well be true. Given, however, that only Lewis was in defendant's house and only he could directly refute defendant's version of the facts (which R corroborated), we cannot conclude that there is little likelihood that the jury's verdict would have been affected had they decided that they could not believe Lewis.

Finally, we reject the state's suggestion that, because Lewis was working with the task force in order to "work off" his own drug charge and, therefore, was motivated to procure an arrest regardless of any interest he may have had in R, the evidence of his purported bias against defendant was merely cumulative of that other evidence. *Cf. State v. Brand*, 301 Or App 59, 73, 455 P3d 960 (2019), *rev den*,

366 Or 259 (2020) ("[T]he erroneous admission of evidence that is merely cumulative of other admitted evidence and not qualitatively different than other admitted evidence is generally harmless." (Internal quotation marks omitted.)). We have previously recognized that, when a witness "may have multiple motivations for testifying to particular facts," the "admission of evidence of one type of bias does not render exclusion of evidence of another type of bias harmless." *Crum*, 287 Or App at 554-55 (internal brackets and quotation marks omitted). Here, the Facebook messages suggested a bias that Lewis had specific to defendant; accordingly, that evidence was qualitatively different from the more generic evidence that he was motivated to "work off" his possession charge. As a result, the erroneously excluded evidence was not merely cumulative and, therefore, the court's error was not harmless.

In sum, by excluding evidence of Lewis's sexual interest in R, the trial court erroneously precluded defendant from presenting evidence qualitatively different from that presented at trial; the excluded evidence would have supported defendant's theory of the case; and the prosecution was able to capitalize on the lack of such evidence to discredit his theory. Accordingly, we cannot say that there was little likelihood that the trial court's error affected the verdict, and we reverse and remand.

Reversed and remanded.